No. 14-1423

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES EX REL. JULIO ESCOBAR; CARMEN CORREA, ADMINISTRATRIX OF
THE ESTATE OF YARUSHKA RIVERA;
*Plaintiffs – Appellants*,

COMMONWEALTH OF MASSACHUSETTS;
*Plaintiff*,

v.

UNIVERSAL HEALTH SERVICES, INC.,
*Defendant – Appellee*.

On Appeal from the United States District Court
for the District of Massachusetts

## SUPPLEMENTAL BRIEF FOR DEFENDANT-APPELLEE
## UNIVERSAL HEALTH SERVICES, INC.

Mark T. Stancil (1st Cir. # 1161364)
Donald Burke (1st Cir. # 1176020)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
    UNTEREINER & SAUBER LLP
1801 K Street NW, Suite 411-L
Washington, DC  20006
mstancil@robbinsrussell.com
dburke@robbinsurssell.com
(202) 775-4500

Mark W. Pearlstein (1st Cir. # 17390)
Laura McLane (1st Cir. # 75115)
Evan D. Panich (1st Cir. # 1161271)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
mpearlstein@mwe.com
lmclane@mwe.com
epanich@mwe.com
(617) 535-4000

August 15, 2016

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure

Defendant-Appellee Universal Health Services, Inc. (UHS) states as follows:

1.      There is no publicly held corporation that owns 10% or more of UHS's stock.

2.      UHS has no parent corporation.

/s/ Evan D. Panich

Dated: August 15, 2016                          Evan D. Panich

i

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT ...........................................................................4

ARGUMENT:

    RELATORS' SECOND AMENDED COMPLAINT WAS PROPERLY DISMISSED ...........................................................................13

    A.  Relators' Complaint Did Not Sufficiently Allege Materiality Under The Exacting Standard Articulated By The Supreme Court ....................13

    B.  Relators' Complaint Did Not Allege Defendant's *Knowledge* Of Materiality, As Required By The Supreme Court's Decision..................24

    C.  Dismissal With Prejudice Is Warranted ...................................27

CONCLUSION .........................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
  732 F.3d 77 (1st Cir. 2013) .................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................20

*Flores-Silva v. McClintock-Hernandez*,
  710 F.3d 1 (1st Cir. 2013) .................................................................27

*Glaros v. Perse*,
  628 F.2d 679 (1st Cir. 1980) .............................................................29

*HSBC Realty Credit Corp. (USA) v. O'Neill*,
  745 F.3d 564 (1st Cir. 2014) ....................................................... 28, 29

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
  780 F.3d 504 (1st Cir. 2015) ....................................................... *passim*

*United States ex rel. Rost v. Pfizer, Inc.*,
  507 F.3d 720 (1st Cir. 2007) .............................................................29

*United States ex. rel. Dresser v. Qualium Corp.*,
  No. 5:12-CV-01745-BLF, 2016 WL 3880763 (N.D. Cal. July 18, 2016)...........21

*United States v. Neifert-White Co.*,
  390 U.S. 228 (1968) ..........................................................................14

*United States v. Science Applications Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ........................................................25

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ................................................................ *passim*

*Vargas v. McNamara*,
  608 F.2d 15 (1st Cir. 1979) ...............................................................29

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ..........................................................................14

# TABLE OF AUTHORITIES—Cont'd

**Page(s)**

**Statutes, Rules, and Regulations:**

31 U.S.C. § 3729 *et seq.*....................................................................1

31 U.S.C. § 3729(a)(1)(A) ........................................................... 4, 15

31 U.S.C. § 3729(b)(1)(A) ........................................................... 7, 24

Fed. R. Civ. P. 8 ............................................................................ 3, 12

Fed. R. Civ. P. 9(b) ....................................................................... 3, 12

Fed. R. Civ. P. 15(a) .........................................................................28

105 Mass. Code Regs. § 140.530(C)(1)(a) ........................................7

130 Mass. Code Regs. § 429.402........................................................5

130 Mass. Code Regs. § 429.422........................................................7

130 Mass. Code Regs. § 429.423(B)(2)...............................................5

130 Mass. Code Regs. § 429.423(B)(2)(e) ..........................................7

130 Mass. Code Regs. § 429.424........................................................7

130 Mass. Code Regs. § 429.439........................................................5

130 Mass. Code Regs. § 429.439(C) ..................................... 5, 7, 22, 23

130 Mass. Code Regs. § 450.235(A)(2) .............................................18

130 Mass. Code Regs. § 450.237......................................................18

130 Mass. Code Regs. § 450.249(B) .................................................18

**Miscellaneous:**

Restatement (Second) of Contracts (1979)........................................10

**TABLE OF AUTHORITIES—Cont'd**

**Page(s)**

Victor E. Schwartz & Phil Goldberg, *Carrots and Sticks: Placing Rewards
   as Well as Punishment in Regulatory and Tort Law*, 51 Harv. J. on Legis.
   315 (2014)............................................................................................................14

---

**SUPPLEMENTAL BRIEF FOR DEFENDANT-APPELLEE
UNIVERSAL HEALTH SERVICES, INC.**

---

Appellee Universal Health Services, Inc. (UHS) respectfully submits this supplemental brief in response to this Court's order of July 18, 2016, directing the parties to address the effect of the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (*Escobar II*). In that decision, the Supreme Court endorsed this Court's view of *falsity* under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, but rejected this Court's theory of *materiality*. As we explain below, the Supreme Court's decision requires dismissal of relators' complaint.

The Supreme Court held that, at least in certain circumstances, FCA relators may establish falsity via the "implied certification theory"—that is, based on allegations that the defendant's claims for payment were impliedly false, even though they contained no express misrepresentations. The Supreme Court's endorsement of that theory, however, was expressly conditioned on its holding that the FCA's materiality element imposes a more "rigorous" and "demanding" limitation than this Court had recognized. *Escobar II*, 136 S. Ct. at 2002-2003. Indeed, the Supreme Court expressly "disagree[d] with the * * * First Circuit's view of materiality: that any statutory, regulatory, or contractual violation is

1

material so long as * * * the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004.

Instead, the Supreme Court held that the touchstone for materiality is that a false statement have an "effect on the *likely* or *actual* behavior" of the government in deciding whether to pay an allegedly false claim. *Escobar II*, 136 S. Ct. at 2002 (emphasis added; internal quotation marks omitted). Under this standard, the government's actual payment decisions constitute critical evidence of materiality. As particularly relevant here: "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements were not material." *Id.* at 2003. What matters, then, is what would—*or did*—happen in the real world with respect to payment decisions once the government knew of the false statements.

Here, relators' complaint dispositively answers that question: Despite multiple investigations in response to relators' administrative complaints, the Commonwealth of Massachusetts did not deny, suspend, withhold, recoup, or otherwise disturb any payment decision. Instead, the Commonwealth imposed only modest administrative remedies, none of which bore any relationship to payment. Relators have accordingly failed to plead materiality under the exacting standard announced by the Supreme Court.

What is more, the Supreme Court's decision makes clear that this challenging materiality standard should be applied with full force at the motion to dismiss stage. *Escobar II*, 136 S. Ct. at 2002-2003. To that end, the Supreme Court expressly rejected this Court's view that any alleged violation of a statutory, regulatory, or contractual obligation that is designated as a "condition of payment" is automatically material to the government's payment decision—just because the government *can* deny payment for a particular violation does not mean that it actually *would*. *Id.* at 2003. Relators were thus required to "plead[] *facts* to support [their] allegations of materiality." *Id.* at 2004 n.6 (emphasis added). But as noted above, the only facts in relators' complaint relevant to materiality show that the Commonwealth chose *not* to deny, withhold, suspend, or recoup payment after fully investigating these allegations. The complaint otherwise contains only bare-bones, conclusory assertions of materiality, which cannot survive the Supreme Court's standard or the strictures of Federal Rules of Civil Procedure 8 and 9(b), and offers no plausible basis to conclude that the violations alleged had an actual or likely effect on the government's payment decisions.

The complaint also fails for a second, independent reason. The Supreme Court held that an FCA plaintiff must show that the "defendant knowingly violated a requirement that *the defendant knows is material* to the Government's payment decision." *Escobar II*, 136 S. Ct. at 1996 (emphasis added). Relators do not plead

this necessary element—even in conclusory fashion—and the complaint is bereft of any factual allegation tending to suggest that UHS knew that the Commonwealth would deny payment based on the alleged violations. If the complaint supports any inference at all, it is that UHS did *not* know that the alleged violations would (when disclosed) lead the Commonwealth to refuse payment. As a result, this Court should affirm the district court's judgment dismissing relators' claims, even if it were to conclude that the alleged false statements were material.

## STATEMENT

1. In its prior opinion in this case, this Court reversed the district court's dismissal of relators' second amended complaint for failure to state a claim. That complaint alleged that a mental health clinic in Lawrence, Massachusetts, owned and operated by an indirect subsidiary of UHS, violated the FCA and parallel state-law provisions. This Court held that relators adequately alleged that the Lawrence clinic had submitted "false or fraudulent" claims, 31 U.S.C. § 3729(a)(1)(A), to the Commonwealth's Medicaid program, MassHealth. See *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504, 508 (1st Cir. 2015) (*Escobar I*).

a. The bulk of relators' claims alleged that the Lawrence clinic violated the FCA by seeking reimbursement from MassHealth even though four staff members who had treated relators' late daughter, Yarushka Rivera, and other unnamed staff

4

members had not been properly supervised as required by MassHealth regulations. J.A. 66-77.  Although relators did not allege that the Lawrence clinic expressly stated that it was in compliance with MassHealth's supervision requirements, this Court concluded that, by submitting claims for reimbursement, the clinic had "implicitly communicated that it had conformed to the relevant program requirements."  *Escobar I*, 780 F.3d at 514 n.14.

In reaching that conclusion, the Court invoked 130 Mass. Code Regs. § 429.439, which sets forth conditions governing services provided by a "satellite" facility connected to another mental health center.  See 130 Mass. Code Regs. § 429.402 (defining "Satellite Facility").  The Lawrence clinic is such a satellite facility because it is connected to another clinic operated by UHS in Malden, Massachusetts.  Among a number of other standards applicable to satellite facilities, Section 429.439 provides that the facility's parent clinic must "designate one professional staff member at the satellite program as the satellite's clinical director."  *Id.* § 429.439(C).  It further provides that "[t]he clinical director must be employed on a full-time basis and meet all of the *requirements* in 130 [Mass. Code Regs. §] 429.423(B)."  *Id.* § 429.439(C) (emphasis added).  Noting that 130 Mass. Code Regs. § 429.423(B)(2) in turn provides that the "responsibilities" of a mental health center's clinical director "include * * * overall supervision of staff performance"—and equating those "responsibilities" with the "requirements" for

the position referenced in Section 429.439(C)—this Court reasoned that the MassHealth regulations made adequate supervision a precondition to payment for services provided at a satellite facility like the Lawrence clinic. See *Escobar I*, 780 F.3d at 514.

Turning to relators' particular allegations, the Court concluded that relators had adequately pleaded that the Lawrence clinic had implicitly "misrepresented compliance with a condition of payment, i.e., proper supervision." *Escobar I*, 780 F.3d at 514. With respect to the FCA's separate materiality element, the Court held that relators "also have properly pleaded that the condition of payment * * * was a material one." *Ibid.* (internal quotation marks omitted). The Court reasoned that "[t]he express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory scheme, constitute dispositive evidence of materiality." *Ibid.* And with respect to scienter, the Court held that relators' complaint adequately alleged that the Lawrence clinic knowingly submitted false claims to MassHealth. *Id.* at 515. This element was satisfied, the Court held, because the Lawrence clinic's clinical director had acknowledged that, until recently, he had been "unaware that supervision was required to be provided on a regular and ongoing bas[i]s, or that the supervision meetings needed to be documented." *Ibid*. In the Court's view, the clinical director's acknowledgment that he was not fully familiar with his

6

supervision obligations sufficed to establish "reckless disregard or deliberate ignorance of the falsity of the information contained in the claims." *Ibid.* (citing 31 U.S.C. § 3729(b)(1)(A)).

b. Relators' remaining claims alleged that the Lawrence clinic had violated the FCA by seeking reimbursement for services despite being in violation of state regulations governing staffing at mental health clinics, because the Lawrence clinic had not employed a board-certified psychiatrist and a licensed psychologist. See J.A. 77-79. None of the regulations that relators cited as establishing this staffing obligation conditioned reimbursement on compliance. See 105 Mass. Code Regs. § 140.530(C)(1)(a); 130 Mass. Code Regs. § 429.422; *id.* § 429.424. Nonetheless, this Court held that, because Section 429.423(B)(2)(e) makes the clinical director "accountab[le] for employing adequate psychiatric staff to meet the psycho-pharmalogical needs of clients," *id.* § 429.423(B)(2)(e), and because it had con-cluded that "claims are reimbursable only if the clinical director fulfills the assigned duties," 780 F.3d at 516 (citing 130 Mass. Code Regs. § 429.439(C)), the "failure to maintain a properly licensed psychiatrist on staff constituted noncompliance with a material condition of payment," *ibid.* The Court also held that this alleged noncompliance "was at least deliberately ignorant," because relators had alleged that they were able to determine that the clinic's staff

psychiatrist was not properly licensed by checking a state licensing database. *Ibid.*[1]

2. The Supreme Court vacated this Court's judgment and remanded the case for further proceedings. *Escobar II*, 136 S. Ct. at 2004.

The Supreme Court first addressed UHS's contention that the implied certification theory is not a proper basis for establishing falsity under the FCA. The Supreme Court rejected that contention, holding instead that the implied certification theory can be invoked to allege falsity, "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar II*, 136 S. Ct. at 2001. Agreeing with this Court, the Supreme Court also held that establishing falsity via the implied certification theory is not limited to "misrepresentations about express conditions of payment." *Ibid*.

In reaching these conclusions, however, the Supreme Court acknowledged that the implied certification theory poses serious "concerns about fair notice and

---

[1] This Court affirmed the dismissal of relators' claims premised on the Lawrence clinic's alleged failure to employ a licensed psychologist. *Escobar I*, 780 F.3d at 516 n.16. Because the "regulations do not mandate that a psychologist be on staff at all times," the Court held that relators' allegation that a staff member who held herself out as a psychologist was not licensed did not establish any regulatory violation. *Ibid*.

open-ended liability" under the FCA. *Escobar II*, 136 S. Ct. at 2002. It then held

that these concerns "can be effectively addressed through strict enforcement of the

Act's materiality and scienter requirements." *Ibid.* (internal quotation marks

omitted). Thus, the Supreme Court's willingness to endorse the implied

certification theory hinged on its understanding that, properly applied, the FCA's

materiality requirement is much stronger and more rigorous than the one this Court

had applied and that the United States (as amicus curiae) had urged the Supreme

Court to adopt. See U.S. Amicus Br. 30 ("When a law or contract states explicitly

that payment will be withheld if a particular requirement is not satisfied, the

requirement is undoubtedly 'material' under the FCA definition."); Tr. of Oral

Argument 40 (contending that a claim is materially false or fraudulent "if under the

terms of the agreement * * * the government would be legally entitled to withhold

payment or a portion of the payment in that circumstance").

The Supreme Court explained that it "disagree[d] with the Government's

and First Circuit's view" of materiality. *Escobar II*, 136 S. Ct. at 2004; see also

*ibid.* (holding that "both opinions below assessed [relators'] complaint based on

interpretations of § 3729(a)(1)(A) that differ from ours"). More particularly, the

Court explicitly rejected the argument that a statutory, regulatory, or contractual

violation is material if the government "would be entitled to refuse payment were it

aware of the violation." *Ibid*. As the Court put it, "[t]he False Claims Act does not

adopt such an extraordinarily expansive view of liability." *Ibid.*; see also *id.* at 2003 ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal quotation marks omitted).

Instead, the FCA's "materiality standard is demanding" and—critically for present purposes—requires courts to "look[] to the effect on the *likely or actual* behavior of the recipient of the alleged misrepresentation." *Id.* at 2002, 2003 (emphasis added; internal quotation marks omitted). A representation is material only if "it would 'likely * * * induce a reasonable person to manifest his assent'" to the defendant's claim for payment, or if "the defendant 'knows that for some special reason [the misrepresentation] is likely to induce the particular recipient to manifest his assent' to the transaction." *Id.* at 2003 (quoting Restatement (Second) of Contracts § 162(2) & cmt. c (1979)). Under this standard—which makes a likely or actual effect on the government's payment decision the touchstone for materiality—"[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." And it is not "sufficient for a finding of materiality that the Government would have the *option* to decline to pay if it knew of the defendant's noncompliance." *Ibid.* (emphasis added).

Thus, although "the Government's decision to expressly identify a provision as a condition of payment is relevant," it is "not automatically dispositive." *Escobar II*, 136 S. Ct. at 2003. Rather, the government's *actual* payment decisions constitute critical evidence of materiality. For example, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" would tend to support a finding of materiality. *Ibid.* By contrast, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003-2004.

And in certain circumstances it will not be necessary to surmise what the government was likely to have done, because the government's actual behavior with respect to payment in the face of the relator's allegations will be known. "*[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.*" *Escobar II*, 136 S. Ct. at 2003 (emphasis added). Again, the benchmark for materiality is whether, in the real world, the government would deny payment of the claim if it knew of the alleged violations.

11

The Court emphasized that the FCA's materiality element can and should be enforced at the motion to dismiss stage.  Stressing the "rigorous" nature of the FCA's materiality requirement, the Court held that "False Claims Act plaintiffs must * * * plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."  *Escobar II*, 136 S. Ct. at 2004 n.6.  And those requirements, in turn, mean that FCA plaintiffs must "plead[] facts to support allegations of materiality."  *Ibid.*

Finally, the Court held that, even if a relator has adequately alleged materiality under this standard, that is not enough to state a claim.  Rather, the plaintiff must also demonstrate that the "defendant knowingly violated a requirement that the defendant *knows is material* to the Government's payment decision."  *Escobar II*, 136 S. Ct. at 1996 (emphasis added); see also *id.* at 2001 (holding that the FCA's scienter element does not limit the Act's scope to expressly designated conditions of payment, because "[a] defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment").  A relator must therefore allege—with the particularity required by Federal Rules of Civil Procedure 8 and 9(b)—that the defendant knew that the government would, in the real world, deny payment for the claims if the government was aware of the alleged falsity.

12

## ARGUMENT

**RELATORS' SECOND AMENDED COMPLAINT WAS PROPERLY DISMISSED**

### A.    Relators' Complaint Did Not Sufficiently Allege Materiality Under The Exacting Standard Articulated By The Supreme Court

1.    Relators' complaint does not state a claim under the FCA because it failed to allege materiality under the "rigorous" standard announced by the Supreme Court. *Escobar II*, 136 S. Ct. at 2002. To establish materiality, an FCA plaintiff must demonstrate that the defendant's misrepresentation affected "the likely or actual behavior of the recipient" with respect to payment. *Ibid.* (internal quotation marks omitted). A *possible* effect on the government's decision whether to pay a claim is not enough. Likewise, an effect on some regulatory or administrative function *other than payment* is not enough. Thus, the government's actual payment decisions constitute critical evidence of materiality:   "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements were not material." *Id.* at 2003.

The Supreme Court understood that rigorous application of the FCA's materiality standard is necessary to address the very real "concerns about fair notice and open-ended liability," *Escobar II*, 136 S. Ct. 2002, that follow directly from the implied-certification theory of falsity under the FCA. That theory charges a defendant with fraud not on the basis of anything the defendant *said*, but rather

13

on the basis of what the defendant *failed to say*. If the "essentially punitive" liability imposed by the FCA, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000), is to be limited to its intended scope as a remedy for fraud against the government, see, *e.g.*, *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), then claims under the FCA may proceed only when the defendant's misrepresentation had an actual or likely effect on the government's payment decision. See *Escobar II*, 136 S. Ct. at 2003.

Careful application of the materiality standard is also particularly important in the context of sprawling regulatory schemes, such as federal healthcare programs. To state the obvious, healthcare providers participating in these programs face a breathtaking volume of program requirements and regulatory obligations. By one count, these rules occupy approximately *130,000 pages*. See Victor E. Schwartz & Phil Goldberg, *Carrots and Sticks: Placing Rewards as Well as Punishment in Regulatory and Tort Law*, 51 Harv. J. on Legis. 315, 350 (2014). At oral argument in the Supreme Court, counsel for the United States (perhaps unintentionally) illustrated precisely why assertions of materiality untethered to likely or actual payment decisions make no sense. Responding to a question by Justice Kagan as to "[w]hat would count as *not* material," Tr. of Oral Argument 45 (emphasis added), counsel responded: "I mean, I don't know if there are any terms that are wholly immaterial, because if there were, presumably they wouldn't be in

14

the—the agreement or the—the regulations," *ibid.*  The government's counsel admitted only that "there are certainly terms that would be immaterial to particular claims," *ibid.*, but nothing was necessarily off-limits.  The government's assertion that every jot and tittle of a massive regulatory framework is (at least potentially) material provides no meaningful limitation whatsoever.

The Supreme Court emphatically rejected the government's view.  As the Supreme Court emphasized, it is the requirement of materiality—an effect on the government's actual or likely payment decisions in the real world—that separates run-of-the-mill violations of this highly technical and complex body of law from the "false or fraudulent claim[s]," 31 U.S.C. § 3729(a)(1)(A), that may support liability under the FCA.  See *Escobar II*, 136 S. Ct. at 2003.  If this critical distinction is not observed, the result will be unbounded liability for government contractors.  And again, that is particularly concerning for healthcare providers, which operate in perhaps the most complex regulatory environment of all.  Imposing excessive FCA liability on those providers will, in turn, diminish the resources available to serve needy program participants.  Indeed, such draconian sanctions may have the perverse effect of driving providers from the market or reducing their scope of services, to the detriment of program participants for whom access to care is a common obstacle.

2. Here, there is no uncertainty about the effect of the alleged regulatory violations on the "likely or actual behavior" of MassHealth in evaluating the Lawrence clinic's claims for payment. *Escobar II*, 136 S. Ct. at 2002 (internal quotation marks omitted). The complaint contains detailed allegations regarding administrative complaints relators filed with three state agencies following their daughter's death: the Disabled Persons Protection Committee (DPPC), the Division of Professional Licensure (DPL), and the Department of Public Health (DPH). J.A. 54-66. Each of these agencies of investigated relators' allegations at length and issued findings, but the Commonwealth never ceased making payments or sought to withhold, suspend, or recover payments from the Lawrence clinic, and it imposed only modest administrative remedies designed to address the regulatory deficiencies identified in these investigations.

According to a report summarizing the DPPC's investigation, attached by relators to their complaint, the DPPC concluded that Rivera had not been subjected to "abuse" by a caregiver, as relators had alleged. J.A. 235-236. Meanwhile, DPL investigations of two staff members at the Lawrence clinic led to consensual resolutions that imposed relatively minor penalties on the individual staff members. The Lawrence clinic's clinical director, who was alleged to have authorized the unlicensed practice of social work by a counselor, agreed that his license to practice social work would be subjected to a two-year period of

16

supervised probation, during which he would be supervised by an independent monitor. See J.A. 268-271. Another staff member, who had allegedly held herself out as a psychologist despite not possessing the necessary credentials for that position, agreed to pay a civil penalty of $1,000 and to refrain from holding herself out as a licensed psychologist. J.A. 273-275. Neither the DPCC nor DPL imposed any remedy on the Lawrence clinic itself.

A DPH investigation of the Lawrence clinic, the results of which also were attached to relators' complaint, found deficiencies in the clinic's operations, including violations of DPH regulations governing the required credentials for clinic staff and the supervision of staff members. J.A. 289-295. The DPH accepted a "Plan of Correction" for the Lawrence clinic, which contained steps to address each regulatory deficiency noted in the report. J.A. 35-38.[2] The plan required the clinic to improve its documentation of supervision, to provide "1 hour of individual supervision" to clinicians who were not licensed to practice independently, and to provide all clinicians with "access to weekly group supervision." J.A 38.

Critically, relators' complaint did not allege that the Commonwealth ever sought to deny, withhold, suspend, or recover amounts paid to the Lawrence clinic

---

[2] The portion of the DPH report documenting the Lawrence clinic's Plan of Correction was included as part of an exhibit attached to relators' first amended complaint (J.A. 15-38), but was omitted from the version of that exhibit attached to relators' second amended complaint (J.A. 276-295).

as a result of any regulatory violations.  Indeed, although the reports attached to the complaint make clear that the Commonwealth had been aware of allegations that certain clinic staff were not properly credentialed or supervised, there is no allegation (nor could there be) that the Commonwealth ever stopped paying claims for services provided by the clinic or by those staff members in particular.  What is more, MassHealth's regulations provide the agency with broad authority to initiate an administrative proceeding to recover any *prior* "overpayment," see 130 Mass. Code Regs. § 450.237, and define "overpayment" to include any amount paid "for services that were not payable under MassHealth on the date of service."  *Id.* § 450.235(A)(2).   In addition to seeking retrospective recovery of overpaid amounts, MassHealth also has broad authority to withhold payments on a going-forward basis from any provider that the agency "believes" has "received any overpayments or committed any violations."  *Id.* § 450.249(B).  Yet, despite having multiple alternatives to cease paying or to recover amounts previously paid to the Lawrence clinic, the Commonwealth never sought to take any action with respect to payment.  The Commonwealth instead pursued other administrative remedies to correct the deficiencies it had found at the Lawrence clinic.[3]

---

[3] It bears emphasis that the Commonwealth found regulatory deficiencies that were ongoing as of the time of the DPH investigation.  Thus, if the Commonwealth believed these regulatory deficiencies were material, the Commonwealth could have pursued recovery of (or withholding of payment on account of) recent claims. This was not a case in which the Commonwealth identified long-since corrected

For all relevant purposes, then, circumstances like these—where relators have alleged that the government was fully informed of the regulatory violations at issue and had ready means to stop, offset, or recover payments to the defendant, yet did nothing with respect to those funds—are equivalent to the situation posited by the Supreme Court in which "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Escobar II*, 136 S. Ct. at 2003. If these alleged violations were in fact material to the Commonwealth's actual payment decision, the Commonwealth would have exercised one or more of its payment remedies.

Even if the complaint's allegations regarding the Commonwealth's investigation were not themselves sufficient to negate materiality (and they are), the complaint contains no other allegations that could provide a basis for materiality. As the Supreme Court emphasized, the "demanding" materiality standard, *Escobar II*, 136 S. Ct. at 2003, is fully capable of application at the motion to dismiss stage. See *id.* at 2004 n.6. "False Claims Act plaintiffs must * * * plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Ibid.* But relators' complaint falls far short of that standard.

---

regulatory violations, and may have concluded that any action to recover overpaid amounts would have been stale.

Relators did not, for example, allege that MassHealth "consistently refuses to pay claims in the mine run of cases based on noncompliance" with the regulations on which relators base their claims. *Escobar II*, 136 S. Ct. at 2003. Instead, relators' complaint contains only the most paradigmatically boilerplate assertions of materiality:  In each count, the complaint alleges that certain bills submitted to MassHealth "were materially false and fraudulent," see J.A. 68-92 (Compl. ¶¶ 208, 222, 236, 250, 262, 274, 289, 304, 317, 330, 342, 353, 362, 377), and alleges that, had MassHealth known of the alleged regulatory violations, it would not have reimbursed the Lawrence clinic, see J.A. 69-92 (Compl. ¶¶ 209, 223, 237, 251, 263, 275, 292, 305, 318, 331, 343, 354, 363, 378).

But the complaint contains no *factual* allegations to support those conclusory assertions.  See, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (conclusory allegations are "not entitled to be assumed true").  Indeed, even when allegations are "disguised as factual," they will be treated as "naked conclusions" when they "are so threadbare that they omit any meaningful factual content." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013).  Relators' complaint did not even gesture at factual support for its conclusory allegations, much less set forth allegations that would tend to explain how the government would likely deny payment of the disputed claims when—as other allegations in the complaint make clear—the government was fully aware of the allegations but

never sought to disturb in any way its payment decisions for these or similar claims. Relators have therefore failed to meet their pleading burden. A recent district court decision applying the Supreme Court's decision in *Escobar II* reached precisely this conclusion on strikingly similar facts. *United States ex. rel. Dresser v. Qualium Corp.*, No. 5:12-CV-01745-BLF, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (where complaint alleged "that the government would not have paid Defendants' claims had they known of Defendants' fraudulent conduct, but does not explain why," it did not satisfy the Supreme Court's materiality standard).

Nor can relators' insufficient allegations be rehabilitated by allegations that the Lawrence clinic failed to comply with regulatory requirements that were designated as conditions of payment. See *Escobar I*, 780 F.3d at 514. The Supreme Court expressly rejected this Court's holding that designation of a requirement as a condition of payment is enough to establish that it is material to the government's payment decision. See *Escobar II*, 136 S. Ct at 2004; see also *Dresser*, 2016 WL 3880763, at *6. While relevant to the materiality inquiry, the government's designation of a requirement as a condition of payment can at most establish that compliance has a *conceivable* effect on the government's payment decision. It cannot, standing alone, establish an "effect on the likely or actual behavior" of the government, as is required to establish materiality. *Escobar II*, 136 S. Ct. at 2003 (internal quotation marks omitted). And here, the condition of

payment *does not* stand alone—it stands in stark contrast to the Commonwealth's actual behavior upon investigating these events. Indeed, the Commonwealth's decision not to challenge payment in this case demonstrates precisely why the designation of a regulation as a condition of payment is not determinative of materiality.

Moreover, the details of the regulatory regime at issue here bely any suggestion that characterizing this requirement as a condition of payment provides meaningful evidence of materiality. Under this Court's reading, Section 429.439(C) makes adequate supervision a condition of payment, but *only* with respect to services provided in a satellite facility like the Lawrence clinic. Services provided in parent facilities are not addressed by Section 429.439 at all. Of course, it is implausible to conclude that adequate supervision would be material to the government payment's decision for services provided in satellite clinic, but not with respect to services provided in parent facilities. Yet that is the result that one would have to reach by attaching significance to the government's designation of a requirement as a condition of payment, rather than focusing on the government's record of payment when faced with noncompliance with the pertinent regulations.

Likewise, this Court's prior opinion held that the Lawrence clinic had failed to comply with certain clinic staffing regulations promulgated by the Department of Public Health, even though the clinic *had* complied with the staffing regulations

promulgated by MassHealth itself.  See *Escobar I*, 780 F.3d at 516 n.15.  There is no plausible basis to conclude that, where agencies maintain overlapping (but not fully consistent) regulations, the Lawrence clinic's noncompliance with one set of rules would result in nonpayment even though the clinic *was* in compliance with the other set.  Thus, the fact that Section 429.439(C) was deemed to make compliance with particular staffing rules a condition of payment cannot give rise even to an inference that an allegation of noncompliance would *actually* lead the government to refuse payment.  And, it bears repeating, the complaint itself establishes that the government was aware of the allegations but did not seek to cease or disturb any payments.

The Commonwealth's actual response to relators' administrative complaints reinforces this point.  When the Commonwealth investigated the Lawrence clinic, it determined that the deficiencies in supervision it had identified could be corrected by improving documentation of supervision, providing an additional hour of individual supervision to clinicians who were not licensed to practice independently, and offering all clinicians "access to weekly group supervision." J.A. 38.  These modest adjustments to the clinic's operations were accepted as sufficient by the Commonwealth following a thorough investigation into the very allegations that form the basis of relators' complaint.  The Commonwealth's measured response thus refutes any suggestion that the violations alleged here were

so significant that they can be *assumed* to be material to the Commonwealth's payment decision, particularly without any factual allegations lending plausibility to that assertion.

* * *

Under the Supreme Court's decision, relators were required to "plead[] *facts* to support [their] allegations of materiality." *Escobar II*, 136 S. Ct. at 2004 n.6 (emphasis added). But the complaint's allegations demonstrate precisely the opposite: that the alleged regulatory violations at issue here were not material to the government's payment decision. Relators' complaint was therefore properly dismissed.

## B. Relators' Complaint Did Not Allege Defendant's *Knowledge* Of Materiality, As Required By The Supreme Court's Decision

Relators' complaint was also properly dismissed because it failed to allege a critical element of an FCA claim identified by the Supreme Court's opinion: the defendant's knowledge (as that term is defined in the FCA) that the statutory, regulatory, or contractual requirement it is alleged to have violated was material to the government's payment decision. See 31 U.S.C. § 3729(b)(1)(A) (defining "knowingly" to include acting with "actual knowledge," "deliberate ignorance," and "reckless disregard"). The Court held that the plaintiff must demonstrate that the "defendant knowingly violated a requirement that *the defendant knows is*

24

*material* to the Government's payment decision." *Escobar II*, 136 S. Ct. at 1996 (emphasis added).

Requiring knowledge of materiality in implied-certification cases makes abundant sense. As the D.C. Circuit has explained, in the absence of such evidence—*i.e.*, when the defendant did not understand that the government was relying on it to disclose noncompliance—there is no basis to conclude that the "defendant sought government payment through deceit." *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010). Both the relators and the United States acknowledged as much during oral argument in this case before the Supreme Court. See Tr. of Oral Argument 26 (counsel for relators acknowledging that the defendant "has to know that [the requirement] was important to the government"); *id.* at 43 (counsel for United States, as amicus curiae, acknowledging that the FCA's scienter element "applies both to knowledge of the breach, and knowledge that it is material to the government").

Here, relators' complaint did not allege that the Lawrence clinic knew that the regulations it was alleged to have violated were material to the government's payment decision (or acted in reckless disregard of any such risk). Instead, the complaint's allegations of scienter focused exclusively on the clinic's knowledge of the underlying regulatory violations. See, *e.g.*, J.A. 71, 73 (Compl. ¶¶ 232, 249). But that is insufficient to plead scienter under the rule announced by the

Supreme Court; the relator must allege both knowledge of the underlying violation *and* knowledge that the violation was material. Put another way, a defendant who knowingly violates a regulation the defendant believes is immaterial to payment—even if the regulation turns out, in fact, to be material—lacks the scienter required to commit fraud within the meaning of the FCA.

Indeed, if the complaint supports any inference at all on this question, it is that the defendant *did not* know that these violations were material to the government's payment decision. As we have explained (see pp. 16-24, *supra*), relators' complaint shows that these alleged violations were *not* material to the government's payment decision. But even if that were not true, at the absolute minimum the Commonwealth's measured reaction to relators' administrative complaints makes it implausible to *assume*—without even a conclusory assertion in relators' complaint, much less one properly supported with actual factual allegations—that the clinic must have known that the alleged violations at issue here were material.

More particularly, following a thorough investigation of relators' allegations, the Commonwealth did not cease or withhold payments or make any attempt to recover amounts paid to the Lawrence clinic, nor did it seek to impose harsh non-monetary sanctions. Instead, it required only the modest adjustments to the operations of the Lawrence clinic detailed above. In other words, there is no

indication that the Commonwealth itself viewed these alleged regulatory violations as material to its payment decision, or even as requiring particularly serious administrative remedies. There is accordingly no basis to conclude that the Lawrence clinic *must* have understood them to be material.

## C.    Dismissal With Prejudice Is Warranted

The district court's dismissal of relators' complaint with prejudice should be affirmed. Any request for leave to amend that comes after the deadline established by the district court requires a showing of "good cause." See *Flores-Silva v. McClintock-Hernandez*, 710 F.3d 1, 3 (1st Cir. 2013). That standard applies here, because the district court ordered relators to file a "final amended complaint" by February 25, 2013. Dkt. 47. Relators filed their second amended complaint—the dismissal of which is on appeal here—by that deadline, but any further amendment would require a showing of good cause. Relators never sought to make such a showing in the district court or in the appellate proceedings in this case. That is itself a sufficient reason to deny leave to amend. See *Flores*, 710 F.3d at 4 (affirming denial of leave to amend where plaintiff "did not even attempt to justify the request despite the fact that the deadlines set in the scheduling order had already passed").[4]

---

[4] This Court's prior opinion remanded this case to the district court, where proceedings continued for approximately nine months, until shortly after the Supreme Court granted certiorari. During this period, relators filed a third

In any event, any request for leave to amend would also fail under the more forgiving "freely give[n]" standard for amendment set forth in Federal Rule of Civil Procedure 15(a). Even under that standard, reasons for denying a motion to amend include, among other things, "futility." *HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 578 (1st Cir. 2014). And there is every indication that amendment would be entirely futile here.

As discussed above (see pp. 16-24, *supra*), relators' own complaint makes clear that the regulatory violations they alleged were not material to the government's payment decision. There is no plausible set of facts that could

---

amended complaint, which included claims tracking this Court's reasoning in reversing the district court's dismissal of the second amended complaint. See Dkt. 89. The filing of that complaint was thus a product of this Court's conclusion that the second amended complaint stated valid claims for relief. Because that conclusion remains at issue here, the filing of the third amended complaint has no effect on the proper disposition of this appeal.

At a status conference held on July 14, 2015, the district court granted relators leave to file a fourth amended complaint, solely for the purpose of substituting HRI Clinic, Inc., as the correct defendant. See Dkt. 91 (setting deadline for "the filing of a fourth amended complaint (substituting defendant by name)"); Dkt. 102, at 4-5. On August 13, 2015, however, relators filed a fourth amended complaint that added two *additional* defendants, while retaining UHS as a defendant, and also advanced a host of new allegations and legal theories. See Dkt. 101. The defendants moved to dismiss that complaint in part, explaining that it had been filed without leave of court to the extent that it did more than substitute HRI as the sole defendant, and arguing that relators' new allegations were unavailing on the merits in any event. See Dkt. 105; Dkt. 106. Defendants' motion to dismiss remained pending when, on December 18, 2015, the district court granted a stipulated motion to stay further proceedings pending the Supreme Court's decision. See Dkt. 119.

suggest that, even though multiple state agencies investigated the relators' allegations and imposed only modest remedies—and sought *no* remedies directed at funds paid to the Lawrence clinic—the Commonwealth would nonetheless actually deny payment for these violations. There is, in short, no apparent basis for relators to escape the conclusion that the Commonwealth knew about these allegations but declined to disturb its payment decisions in any way. See *HSBC Realty Credit Corp.*, 745 F.3d at 578 (explaining that a plaintiff must "provide[] * * * additional facts which, if repled, would permit him to cross the plausibility threshold").[5]

---

[5] The decision whether to allow amendment is committed in the first instance to the district court's discretion. As a result, in cases in which the record would support an exercise of that discretion either way, this Court has frequently remanded for a decision by the district court in the first instance. See, *e.g.*, *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 733 (1st Cir. 2007); *Glaros v. Perse*, 628 F.2d 679, 687 (1st Cir. 1980); *Vargas v. McNamara*, 608 F.2d 15, 19 (1st Cir. 1979). Thus, if this Court were to determine that amendment would not necessarily be futile, this case should be remanded to the district court for a determination of whether amendment is otherwise proper. UHS reserves the right to challenge on any ground (not just that amendment would be futile) any future attempt by relators to further amend their complaint. Unless and until such further amendment is proffered, it is difficult to predict every way in which it may be improper.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

|  | /s/ Evan D. Panich |
|---|---|
| Mark T. Stancil (1st Cir. # 1161364) | Mark W. Pearlstein (1st Cir. # 17390) |
| Donald Burke (1st Cir. # 1176020) | Laura McLane (1st Cir. # 75115) |
| ROBBINS, RUSSELL, ENGLERT, ORSECK, | Evan D. Panich (1st Cir. # 1161271) |
|    UNTEREINER & SAUBER LLP | MCDERMOTT WILL & EMERY LLP |
| 1801 K Street NW, Suite 411-L | 28 State Street |
| Washington, DC  20006 | Boston, MA 02109 |
| mstancil@robbinsrussell.com | mpearlstein@mwe.com |
| dburke@robbinsurssell.com | lmclane@mwe.com |
| (202) 775-4500 | epanich@mwe.com |
|  | (617) 535-4000 |

August 15, 2016

30

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with this Court's order of July 18, 2016 because it contains 6,843 words exclusive of the words contained in the sections of the bieef identified in Federal Rule of Appellate Procedure 32(a)(7)(iii).

2.    This brief, composed in proportionally spaced 14-point Times New Roman typeface, complies with Federal Rule of Appellate Procedure 32(a)(5).


Dated: August 15, 2016                    /s/ Evan D. Panich
                                          Evan D. Panich

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2016, I will electronically file the foregoing document with the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

> Thomas M. Greene
> GREENE LLP
> One Liberty Square, Suite 1200
> Boston, MA 02109
> *Lead Counsel for Appellants Julio Escobar and Carmen Correa*

Dated:  August 15, 2016                    /s/ Evan D. Panich
                                           Evan D. Panich