# 14-1423

## United States Court of Appeals
## for the First Circuit

UNITED STATES AND COMMONWEALTH OF MASSACHUSETTS EX
REL. JULIO ESCOBAR AND CARMEN CORREA

*Plaintiffs-Appellants*

v.

UNIVERSAL HEALTH SERVICES, INC.

*Defendant-Appellee*

On Remand from the Supreme Court of the United States

## APPELLANTS' SUPPLEMENTAL BRIEF

THOMAS M. GREENE (Bar No. 1110304)
MICHAEL TABB (Bar No. 56721)
ELIZABETH CHO (Bar No. 1175798)
GREENE LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040

August 15, 2016                    *Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUE ................................................................. 2

STATEMENT OF THE CASE ................................................................. 2

    PROCEDURAL HISTORY............................................................. 2

    STATEMENT OF THE FACTS RELEVANT TO THE
    MATERIALITY OF UHS'S MISREPRESENTATIONS ........... 12

    A. MassHealth's Regulation of the Qualifications and
        Supervision of Mental Health Professionals Eligible
        to Seek Reimbursement for Services ......................... 12

    B. MassHealth Service Codes and Descriptions...................... 16

    C. Factual Allegations Relevant to the Materiality of the
        Misrepresentations Made by UHS ............................ 18

SUMMARY OF THE ARGUMENT ........................................................ 24

ARGUMENT ............................................................................................. 29

I.    THE RELATORS' COMPLAINT SATISFIES THE FCA'S
    MATERIALITY PLEADING REQUIREMENT IF IT
    CONTAINS PLAUSIBLE FACTUAL ALLEGATIONS
    THAT UHS MISREPRESENTED INFORMATION
    SUFFICIENTLY IMPORTANT TO INFLUENCE
    MASSHEALTH'S PAYMENT DECISIONS ..................................... 32

    A. UHS's Misrepresentations to MassHealth are Material
    if They Would Have Been Sufficiently Important to
    Influence MassHealth's Payment Decisions ...................... 32

B. This Court's Materiality Analysis in *Escobar I* May Be Consistent with the Supreme Court's Instruction. ............ 35

II.   THERE IS A SUFFICIENT BASIS TO FIND THAT HAD MASSHEALTH BEEN AWARE OF UHS'S FAILURES TO STAFF ITS CENTERS WITH QUALIFIED STAFF OR PROVIDE APPROPRIATE SUPERVISION, IT WOULD NOT HAVE PAID THE CLAIMS AT ISSUE .................................... 40

A. The Provision of Qualified and Supervised Mental Health Workers Was Essential to That for Which MassHealth Contracted and Paid ........................................ 41

B.  UHS's False Claims Concern Conditions of Payment That Were Not Insignificant and Which MassHealth Would Likely Enforce ........................................................... 44

1. The qualification and supervision requirements are central to MassHealth's provision of quality mental health services to its members, and meeting these requirements are conditions of payment. .................................................................. 44

2.  This case does not fall into the narrow category of cases in which an express condition of payment is not material. ......................................... 50

C. The Service Codes in Claims Submitted by UHS Required Compliance with the MassHealth's Qualifications and Supervision Requirements .................. 52

D. UHS's Concealment of the Fact that its Therapists were Unlicensed Evidences the Materiality of its Misrepresentations .................................................................. 55

ii

III.   WHETHER MASSHEALTH PAID CLAIMS WITH
ACTUAL NOTICE OF UHS'S NON-COMPLIANCE
IS A QUESTION OF FACT THAT CANNOT BE
DETERMINED AT THIS STAGE   .................................................... 58

IV.   IN THE EVENT THE MATERIALITY TEST
OUTLINES BY THE SUPREME COURT FOR FCA
CASES IS SUBSTANTIVELY DIFFERENT THAN THE
MATERIALITY ANALYSIS PREVIOUSLY APPLIED
IN THE CIRCUIT, THE RELATORS SHOULD BE
GIVEN AN OPPORTUNITY TO AMEND THEIR
COMPLAINT ......................................................................... 65

CONCLUSION ......................................................................... 68

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Basic, Inc. v. Levinson,* 485 U.S. 224 (1988) ................................. 60

*Coll. Hill Props., LLC v. City of Worcester,*
    821 F.3d 193 (1st Cir. 2016) ............................................................ 32

*Grande v. St. Paul Fire & Marine Ins. Co.,*
    436 F.3d 277 (1st Cir. 2006) ........................................................ 61-62

*Harrison v. Westinghouse Savannah River Co.,*
    176 F.3d 776 (4th Cir. 1999) ........................................................... 45

*J.A. Jones Constr. Co. v. United States*, 390 F.2d 886 (Ct. Cl. 1968) ........ 63

*Jones ex rel. U.S. v. Mass. Gen. Hosp.*, 780 F.3d 479 (1st Cir. 2015) ........ 35

*Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 178 N.E. 672 (1931) ............. 34

*Massachusetts v. Mylan Labs.,* 608 F. Supp. 2d 127 (D. Mass. 2008) ..... 63

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ................. 36, 60

*Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp.,*
    523 F.3d 75 (1st Cir. 2008) .............................................................. 57

*Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp.,*
    649 F.3d 5 (1st Cir. 2011) ................................................................ 57

*Ms. S v. Reg'l Sch. Unit 72,*
    ___ F.3d ___, 2016 WL 3854470 (1st Cir. July 15, 2016) ........ 47, 53

*Neder v. United States*, 527 U.S. 1 (1999)............................................ 34, 35

iv

*New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) .............................. 5

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
       ___ U.S. ___, 135 S. Ct. 1318 (2015) ................................................ 30

*Rodowicz v. Mass. Mut. Life Ins. Co.*, 192 F.3d 162 (1st Cir. 1999) ......... 30

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .......................... 61

*Universal Health Servs., Inc. v. United States*,
       ___ U.S. ___, 136 S. Ct. 1989 (2016) ("*Escobar II*") ................. *passim*

*United States v. Gaudin*, 515 U.S. 506 (1995) ...................................... 35, 61

*United States v. Prieto*, 812 F.3d 6 (1st Cir. 2016) ................................ 30-31

*United States v. Sci. Applications Int'l Corp.*,
       626 F.3d 1257 (D.C. Cir. 2010) ....................................................... 10

*United States v. Universal Health Servs., Inc.*,
       780 F.3d 504 (1st Cir. 2015) ("*Escobar I*") .............................. *passim*

*United States ex rel. Dresser v. Qualium Corp.*,
       2016 WL 3880763 (N.D. Cal. July 18, 2016) .................................. 66

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
       2014 WL 1271757 (D. Mass. Mar. 26, 2014) ................................... 5

*United States ex rel. Loughren v. Unum Grp.*,
       613 F.3d 300 (1st Cir. 2010) ................................................. 31, 35, 36

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
       ___ F.3d ___, 2016 WL 3568145 (1st Cir. June 30, 2016) ....... 33, 34

*Wyler v. Korean Air Lines Co.*, 928 F.2d 1167 (D.C. Cir. 1991) .............. 63

**Statutes**

31 U.S.C. § 3729 *et seq.*............................................................................... 2

31 U.S.C. § 3729(a)(1)(A) ...................................................3-4, 12, 30, 35

31 U.S.C. § 3729(b)(4) ............................................................................... 34

31 U.S.C. § 3730(e)(4)(B)(2) ................................................................... 33

12 M.G.L. § 5A *et seq.*................................................................................ 2

**Regulations**

101 Mass. Code Regs. § 317.01(2)(b) ...................................................... 15

105 Mass. Code Regs. § 140 ....................................................................... 64

105 Mass. Code Regs. § 140.330 ............................................................... 24

130 Mass. Code Regs. § 140.530 ............................................................... 23

130 Mass. Code Regs. § 429.221 (2008).................................................... 66

130 Mass. Code Regs. § 429.408(C) (2008) ............................................. 15

130 Mass. Code Regs. § 429.421(A)(2) (2008) ................................... 14, 47

130 Mass. Code Regs. § 429.422 (2008)................................................. 9, 48

130 Mass. Code Regs.§ 429.423 (2008)............................................... 45, 46

130 Mass. Code Regs. § 429.423(B) (2008)............................................. 48

130 Mass. Code Regs. § 429.423(B)(2)(c) and (e) (2008) ....................... 15

130 Mass. Code Regs. § 429.423(C) (2008) .............................................. 15

130 Mass. Code Regs. § 429.424 (2008)............................................. *passim*

130 Mass. Code Regs. § 429.424(A)(1) (2008) ........................................ 13

130 Mass. Code Regs. § 429.424(B)(2) (2008) ........................................ 13

130 Mass. Code Regs. § 429.424(C) (2008) .............................................. 9

130 Mass. Code Regs. § 429.424(C)(2) (2008) ........................................ 14

130 Mass. Code Regs. § 429.424(E)(1) (2008) ........................................ 14

130 Mass. Code Regs. § 429.437 (2008)............................................. 45, 48

130 Mass. Code Regs. § 429.438 (2008)................................................... 48

130 Mass. Code Regs. § 429.438(E) (2008)........................................ 15, 48

130 Mass. Code Regs. § 429.439 (2008).......................... 38, 45, 46, 48, 51

130 Mass. Code Regs.§ 429.441 (2008)............................................. 48, 66

130 Mass. Code Regs. § 429.441(A) (2008) ................................. 14, 49, 51

130 Mass. Code Regs. § 429.441(A)(1) (2008) ........................................ 47

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................... 7

Fed. R. Civ. P. 12(b)(6) ...................................................... 32, 40

**Treatises and Other Authorities**

MassHealth Mental Health Center Manual, § 601 ....................17, 53-54

MassHealth Transmittal Letter MHC-39 (2009) ............................. 17, 53

MassHealth Transmittal Letter MHC-47 (2014) ............................ 17, 53

26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003)......... 11, 33, 34

Restatement (Second) of Torts, § 538 (1977).................................... 33, 34

## <u>JURISDICTIONAL STATEMENT</u>

This case is in this Court after a Judgment from the Supreme Court of the United States in *Universal Health Services, Inc. v. United States*, ___ U.S. ___, 136 S. Ct. 1989 (2016) ("*Escobar II*"), vacating and remanding this matter for further consideration by this Court in light of its opinion. This brief is being submitted pursuant to an Order of this Court dated July 18, 2016 requesting further briefing from the parties addressing the effect of *Escobar II* on this case.

This case was originally filed in the District Court for the District of Massachusetts pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*. The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732. A final judgment was entered by the district court on March 28, 2014. A Notice of Appeal was timely filed on April 14, 2014. (JA[1] at 8, Entry #70). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] "JA" refers to the Joint Appendix that was originally submitted by the parties on August 18, 2014.

1

This Court has previously issued an opinion on this case: *United*

*States ex rel. Escobar v. Universal Health Services, Inc.*, 780 F.3d 504 (1st Cir.

2015) ("*Escobar I*").


## STATEMENT OF THE ISSUE

Where the relator in a proceeding under the False Claims Act,

31 U.S.C. § 3729 *et seq.*, has alleged that the defendant has misrepresented

its compliance with mental health facility requirements that are so central

to the provision of mental health counseling that the Medicaid program to

whom the defendant's claims were presented would not have paid the

claims had it known of these violations, has the relator adequately pleaded

a violation of the False Claims Act?


## STATEMENT OF THE CASE

### PROCEDURAL HISTORY

This action, brought under the federal and Massachusetts False

Claims Acts ("FCA"), 31 U.S.C. § 3729 *et seq.*, and 12 M.G.L. § 5A *et seq.*,

returns to this Court after a remand from the Supreme Court of the United

States.  The relators, Julio Escobar and Carmen Correa ("Relators") have

alleged that Defendant Universal Health Services, Inc. ("UHS") routinely

presented false claims to the state agency that administered the

Massachusetts Medicaid program, MassHealth, by routinely seeking

payment for mental health services which were ineligible for

reimbursement because the UHS employees who provided the services

were not licensed or qualified.

Relators filed their *qui tam* complaint under seal in July 2011, bringing

claims under the federal FCA and the Massachusetts FCA.  In March 2012,

the Commonwealth of Massachusetts and the United States declined to

intervene and the complaint was unsealed.  The complaint was served on

UHS in August 2012.  The District Court for the District of Massachusetts

granted the Relators leave to file their Second Amended Complaint

("SAC"), which was served in February 2013.

Relators' SAC, the operative complaint in this appeal, brought seven

claims under the federal FCA and seven parallel claims under the

Massachusetts FCA.  Each of the counts alleged that UHS had knowingly

presented false claims to MassHealth in violation of 31 U.S.C.

3

§ 3729(a)(1)(A) (or its state law equivalent) by seeking reimbursement for services provided by employees who were not licensed, qualified or properly supervised in accordance with regulations promulgated by MassHealth.[2]  Relators alleged that compliance with the violated regulations were conditions of payment and that MassHealth would not have paid the claims if MassHealth had known of UHS's non-compliance. JA67–79 (SAC ¶¶ 202, 209, 219, 223, 233, 237, 244, 251, 256, 263, 268, 275, 277, 292).

------------------------

[2] Three of the counts (Counts I–III) alleged that UHS presented false claims for mental health services provided by three identified employees who were not licensed or otherwise qualified to bill.  JA 66–72 (SAC ¶¶ 199–237).  Count IV alleged that UHS had submitted false claims on behalf of an identified psychiatric nurse who had improperly prescribed prescription medication without the necessary supervision of a board certified psychiatrist.  JA 72–73 (SAC ¶¶ 239–51).  Counts V and VI alleged that similar false claims were presented by UHS on behalf of other unlicensed, unqualified or unsupervised psychologists, psychiatric nurses, social workers and mental health counselors who were employed at UHS's Lawrence, Massachusetts mental health center.  JA 74–77 (SAC ¶¶ 252–75).  Count VII alleged that UHS had presented false claims because the Lawrence clinic's staff psychiatrist and medical director did not meet the minimum qualifications established by MassHealth, and was not qualified to supervise the clinic's medical staff.  JA 77–79 (SAC ¶¶ 277–99).  The seven counts under the Massachusetts FCA, Counts VIII–XIV, paralleled the seven federal counts.  JA 80–92 (SAC ¶¶ 293–378).

4

UHS moved to dismiss all counts pursuant to Fed. R. Civ. P. 12(b)(6) and the district court granted its motion on March 26, 2014.  The district court concluded that the regulations UHS allegedly violated could not trigger FCA liability because they were conditions of participation rather than conditions of payment.  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 2014 WL 1271757, at *5 (D. Mass. Mar. 26, 2014).  Because the district court concluded that the complaint had not sufficiently pleaded the presentation of actionably false representations, the district court did not reach the issue of materiality.  *Id.* at *11.

This Court reversed the district court in *Escobar I*, holding that FCA liability can be established if "the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment."  780 F.3d 504, 512, *citing New York v. Amgen Inc.*, 652 F.3d 103, 110 (1st Cir. 2011).

After reviewing MassHealth's regulatory scheme for mental health centers, which will be discussed below, this Court found that the relevant regulations' requirement that the clinical director ensure "overall supervision of staff performance" made it plain that that reimbursement

5

was conditioned upon fulfillment of that regulatory requirement. *Id.* at 514. In other words, the requirement that UHS adequately supervise its staff was a condition of payment.

Given that the crux of Relators' complaint was that "supervision at Arbour was either grossly inadequate or entirely lacking," this Court found Relators had sufficiently pleaded that UHS's claims for payment were false "in that they misrepresented compliance with a condition of payment, i.e., proper supervision." *Id.* This Court also concluded that the complaint adequately pleaded that appropriate supervision was material to the government's decision to pay. *Id.* This Court held that "[t]he express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory scheme" was dispositive of materiality. *Id.* at 514–15.

This Court also reversed the dismissal of Relators' claims pertaining to UHS's failure to employ at least one board-certified or board-eligible psychiatrist. *Id.* at 516–17. Because MassHealth regulations explicitly require the facility's clinical director to be responsible for "employing adequate psychiatric staff," UHS's failure to maintain a properly

6

credentialed psychiatrist on staff constituted noncompliance with a material condition of payment. *Id*. at 516.

Finally, this Court reversed the dismissal of Relators' claims that UHS violated the FCA in billing for services provided by other unlicensed and unsupervised therapists and nurse practitioners. *Id*. at 516–17. This Court concluded that Relators' complaint had satisfied Federal Rule of Civil Procedure 9(b) by alleging that (1) 22 unlicensed UHS employees had obtained misleading National Provider Identification numbers that falsely identified them as being licensed mental health therapists when in fact those employees had never been licensed; (2) the Massachusetts Department of Public Health (DPH) had determined that, as of January 2012, 23 unlicensed UHS mental health counselors practiced without supervision; and (3) the clinical director at the Lawrence clinic had admitted that the clinic "suffered from a fundamental lack of oversight." *Id.* at 517.

This Court remanded the case to the district court for further proceedings. After this Court refused to rehear the matter *en banc*, UHS

sought review by the United State Supreme Court.  The Supreme Court

granted UHS's petition for writ of certiorari on the following questions:

> 1. Whether the "implied certification" theory of legal falsity
> under the FCA – applied by the First Circuit below but recently
> rejected by the Seventh Circuit – is viable.

> 2. If the "implied certification" theory is viable, whether a
> government contractor's reimbursement claim can be legally
> "false" under that theory if the provider failed to comply with
> a statute, regulation, or contractual provision that does not state
> that it is a condition of payment, as held by the First, Fourth,
> and D.C. Circuits; or whether liability for a legally "false"
> reimbursement claim requires that the statute, regulation,
> or contractual provision *expressly* state that it is a condition of
> payment, as held by the Second and Sixth Circuits.

The Supreme Court rejected UHS's position on both of the questions.

*Escobar II*, 136 S. Ct. 1989.

The Supreme Court first held that FCA liability may be found where

"the defendant submits a claim for payment that makes specific

representations about the goods or services provided, but knowingly fails

to disclose the defendant's noncompliance with a statutory, regulatory, or

contractual requirement."  *Id.* at 1995.  In this context, a defendant may be

liable if its "omission renders those representations misleading."  *Id.*

8

The Supreme Court then concluded that Relators' Second Amended

Complaint stated a claim under this standard. The claims at issue, it ruled,

"fall squarely within the rule that half-truths — representations that state

the truth only so far as it goes, while omitting critical qualifying

information — can be actionable misrepresentations." *Id.* at 2000. The

Supreme Court stated:

> Anyone informed that a social worker at a Massachusetts
> mental health clinic provided a teenage patient with individual
> counseling services would probably — but wrongly — conclude
> that the clinic had complied with core Massachusetts Medicaid
> requirements (1) that a counselor "treating children [is]
> required to have specialized training and experience in
> children's services," 130 Code Mass. Regs. § 429.422, and also
> (2) that, at a minimum, the social worker possesses the
> prescribed qualifications for the job, § 429.424(C). By using
> payment and other codes that conveyed this information
> without disclosing Arbour's many violations of basic staff and
> licensing requirements for mental health facilities, Universal
> Health's claims constituted misrepresentations.

*Id.* at 2000–01.[3]

---

[3] The Supreme Court's discussion on this point forecloses any argument
that Relators did not sufficiently allege that UHS made false implied
representations when it presented its claims for payment to MassHealth.
Accordingly, Relators' Supplemental Brief will focus on whether they
sufficiently alleged that UHS's misrepresentations were material.

9

In response to the second question, the Supreme Court ruled that defendants may be liable under the FCA for violating statutory, regulatory, or contractual requirements "even if they were not expressly designated as conditions of payment." *Id.* at 1996.  The crux of its analysis was that "[n]othing in the text of the False Claims Act supports Universal Health's proposed restriction." *Id.* at 2001.  UHS argued that extra-textual protections were necessary to provide government contractors with fair notice and to "cabin liability."  The Supreme Court vigorously disagreed, holding that there was no statutory basis for the restrictions and "policy arguments cannot supersede the clear statutory text." *Id.* at 2002.  It agreed with this Court that "instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent," the appropriate way to address UHS's concerns is "strict enforcement of the Act's materiality and scienter requirements." *Id., quoting United States v. Science Applications Int'l Corp.,* 626 F.3d 1257, 1270 (D.C. Cir. 2010).

The Supreme Court then examined the FCA's materiality requirement and provided guidance on what sort of evidence satisfies the requirement.  Citing to common law, it observed that "[u]nder any

10

understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)).  The materiality requirement under other federal fraud statutes, as well as the definition of "material" found in the FCA, derived from these precedents and concerned the same inquiry:   whether "a reasonable man would attach importance to [the matter] in determining his choice of action in the transaction"; or if the matter would "likely … induce a reasonable person to manifest his assent."  *Id.* at 2002-03 (citations and internal quotations omitted).

The Supreme Court ruled that when determining whether compliance with a requirement is material to a payment decision, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."  *Id.* at 2003. Evidence of materiality may include "evidence that the defendant knows that the Government consistently refuses to pay claims…based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Id.*  Alternatively, "if the Government regularly pays a

11

particular type of claim in full despite actual knowledge that certain

requirements were violated, and has signaled no change in position, that is

strong evidence that the requirements are not material." *Id.* at 2003-04.

The Supreme Court remanded the case to apply the standard of

materiality it articulated. *Id.* at 2004. The Supreme Court concluded its

opinion by stating:

> Respondents have alleged that Universal Health
> misrepresented its compliance with mental health facility
> requirements that are so central to the provision of mental
> health counseling that the Medicaid program would not have
> paid these claims had it known of these violations.
> Respondents may well have adequately pleaded a violation of
> § 3729(a)(1)(A). But we leave it to the courts below to resolve
> this in the first instance.

*Id.*


## STATEMENT OF THE FACTS RELEVANT TO THE MATERIALITY OF UHS'S MISREPRESENTATIONS

### A.   MassHealth's Regulation of the Qualifications and Supervision of Mental Health Professionals Eligible to Seek Reimbursement for Services

The implied misrepresentations at issue in this case concern whether

UHS complied with MassHealth's regulatory requirements for minimum

qualifications of staff providing mental health care and supervision of

those staff members.  The regulation that sets forth the minimum

requirements for psychiatrists, psychologists, social workers, psychiatric

nurses and mental health counselors is 130 Mass. Code Regs. § 429.424.

Many of the supervision requirements are set out in § 429.424, but

mandatory requirements are also found in other sections of Chapter 429,

the chapter of the Massachusetts Code of Regulations that sets forth

MassHealth's regulations for mental health centers, including satellite

centers such as UHS's Lawrence clinic.[4]

     Section 424 requires every mental health center to have at least one

staff psychiatrist who is either board certified or applying for such

certification.  130 Mass. Code Regs. § 429.424(A)(1).  All staff psychologists

are required to either be currently enrolled in or have completed a

recognized doctoral program.  130 Mass. Code Regs. § 429.424(B)(2).  All

_____

[4] Some of the relevant regulations, including § 429.424, were amended in
April 2014, after the SAC was filed.  A copy of the regulations as they were
in force at the time can be found at
http://www.mass.gov/eohhs/docs/masshealth/transletters-2009/mhc-
39.pdf.  Unless otherwise stated, all references and citations to the
MassHealth mental health care regulations, 130 Mass. Code Regs. § 429.000
*et seq.*, are to the pre-amendment version of the regulations in force when
the SAC was filed.

social workers have to be licensed or applying for licensure and all social

workers other than the chief social worker must be under the "direct and

continuous supervision of an independent clinical social worker." 130

Mass. Code Regs. § 429.424(C)(2). Mental health counselors are not

required to be licensed, but "must be under the direct and continuous

supervision of a fully qualified professional staff member." 130 Mass. Code

Regs. § 429.424(E)(1).

The centrality of § 429.424 to MassHealth's regulatory scheme is

evidenced by the numerous subsections of Chapter 429 which require

compliance with it. The most important of these is § 429.441(A), which

states:

> The MassHealth agency pays for diagnostic and treatment
> services *only when a professional staff member, as defined by 130
> CMR 429.424, personally provides these services* to the member or
> the member's family, or personally consults with a professional
> outside of the center.

(emphasis added); s*ee also* 130 Mass. Code Regs. § 429.421(A)(2) ("All

services must be...delivered by qualified staff in accordance with 130

CMR 429.424.").

In addition to the supervision requirements set forth in § 429.424, additional supervision obligations are prominently set forth in Chapter 429.  Section 429.438(E) provides that "[e]ach staff member must receive supervision appropriate to the person's skills and level of professional development."  Such supervision must include "frequent and regularly scheduled personal contact with the supervisor" and the frequency and extent of supervision must conform to the licensing standards of each discipline.  *Id.*  The center's medical director, who must be board certified (or board eligible and applying for certification), is required to supervise all medical staff.  130 Mass. Code Regs. § 429.423(C).  And the Director of Clinical Services, as this Court has recognized, has extensive supervision responsibilities.  *Escobar I*, 780 F.3d at 513–14; *see* § 429.423(B)(2)(c) and (e). Moreover, MassHealth regulations expressly state that Medicaid payment for mental health services includes payment for supervision.  *See* 130 Mass. Code Regs. § 429.408(C); *see also* 101 Mass. Code Regs. § 317.01(2)(b) (specifying that rates of payment include "any related administrative or supervisory duties in connection with patient care.").

This Court has already determined that MassHealth's qualification and supervision requirements are conditions of payment. *Escobar I*, 780 F.3d at 514.[5] The regulations identified above, however, show that compliance with these requirements may be even more important to the payment decision than the Court had recognized.

### B.     MassHealth Service Codes and Descriptions

The claims UHS submitted to MassHealth contained service codes which identified the services for which UHS sought reimbursement. *See, e.g.*, JA 45, 46 (SAC ¶¶ 40, 41, 48). MassHealth's definitions of the relevant service codes not only identify which services UHS represented it had provided, but also evidence what was material to MassHealth, as the service codes define what MassHealth was supposed to receive in exchange for its reimbursement payments.

---

[5] UHS asked the Supreme Court to overturn this Court's determination that MassHealth's qualifications and supervision requirements are conditions of payment. UHS's Pet. for Cert. at 25–29; Pet. Br. at 57–59. The Supreme Court declined UHS's invitation. Consequently, this Court's prior ruling that these regulations constitute conditions of payment stands.

Many of the false claims Relators allege UHS submitted to

MassHealth bore service codes 90806, 90847, and 90853, which were for the

provision of individual therapy, family therapy and group therapy,

respectively.  At the relevant time,[6] Section 601 of the MassHealth Mental

Health Center Manual defined these codes as follows:

90806        Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 45 to 50 minutes face-to-face with the patient (*by professional staff member as defined in 130 CMR 429.424*).

90847        Family psychotherapy (conjoint psychotherapy) (with patient present) (*by professional staff member as defined in 130 CMR 429.424*).

90853        Group psychotherapy (other than of a multiple-family group) (*by professional staff member as*

---

[6] The definitions of these codes were in effect between 2008 and 2014.  A copy of Section 601 of the Mental Health Center Manual, as it was in effect at that time, is attached to MassHealth Transmittal Letter MHC-39, dated January 2009, a copy of which is located at http://www.mass.gov/eohhs/docs/masshealth/transletters-2009/mhc-39.pdf. The definitions of the service codes were amended in 2014, as evidenced by MassHealth Transmittal Letter MHC-47, a copy of which is located at www.mass.gov/eohhs/docs/masshealth/transletters-2014/mhc-47.pdf.  This amendment is discussed in more detail at footnote 14, *infra.*

17

*defined in 130 CMR 429.424*).

(emphases added).  The definitions of the service codes further evidence

the importance of compliance with the requirements of § 429.424 to

MassHealth.

### C.    Factual Allegations Relevant to the Materiality of the Misrepresentations Made by UHS

Relators learned of UHS's routine misrepresentation of its employees'

qualifications and its failure to provide necessary supervision as a result of

the mental health care UHS provided to Relators' daughter, Yarushka

Rivera.  JA 43-44 (SAC ¶¶ 21-23).  In November 2007, Relators brought

Yarushka to UHS's mental health clinic in Lawrence, Massachusetts after

they learned that Yarushka was experiencing behavioral difficulties at

school.  JA 44, 45 (SAC ¶¶ 24-25, 37-40).

Yarushka was initially treated by two counselors who the Relators

were led to believe were qualified and licensed to treat children.  They

were neither licensed nor qualified.  JA 44, 46-47 (SAC ¶¶ 28–31, 50–53, 63).

Thereafter, Yarushka was treated by a "doctor" who called herself a

psychologist and represented herself as holding a doctorate.  In fact, this

18

employee's degree was from an unrecognized internet college, and the

Massachusetts Board of Licensure had years earlier rejected her application

to obtain the professional license required to practice clinical psychology.

JA 48 (SAC ¶ 64–68).   This "psychologist" diagnosed Yarushka as suffering

from Bi-Polar Disorder, which is ordinarily treated with medication.   JA 48

(SAC ¶ 71).

Relators requested an appointment with a UHS psychiatrist, and

were directed to Maribel Ortiz, who also treated patients at UHS's

Lawrence facility.  Relators were led to believe that Ortiz was a licensed

psychiatrist, when in fact she was only a psychiatric nurse.  JA 49–50 (SAC

¶¶ 81–84).  Ortiz prescribed the medication Trileptal for Yarushka, despite

not being permitted to prescribe medication unless she was supervised by

a board certified psychiatrist.  Notwithstanding MassHealth regulations

requiring all medical staff to be supervised by a board certified

psychiatrist, UHS had no person with such qualifications on the staff of the

Lawrence clinic.  Its only psychiatrist was not board certified and she did

not supervise the medical treatment of the Lawrence clinic's patients.  JA

50, 52 (SAC ¶¶ 87, 107–09).

Within a day after taking Trileptal, Yarushka experienced dizziness, headaches, and swelling in her eyes.  JA 187.  Yarushka repeatedly called Ortiz and left messages describing the medication's side effects.  JA 187–88.  Ortiz, believing that Yarushka was merely suffering from a "case of the red eyes," chose not to return her calls.  JA 177.

Due to the side effects' severity, Yarushka stopped using Trileptal. JA 188.  Ortiz never disclosed that suddenly discontinuing Trileptal may cause seizures.  JA 51 (SAC ¶ 94–95).  Days later, Yarushka, who had no seizure history, suffered a seizure, requiring hospitalization.  JA 51 (SAC ¶ 92).

Over the summer and into the fall of 2009, Yarushka continued to receive treatment from the Lawrence clinic.  JA 53 (SAC ¶ 113).  In October 2009— while she was alone in her bedroom—Yarushka suffered a fatal seizure and died.  JA 189.

UHS treated Yarushka for nearly two years, billing MassHealth for clinical evaluation, individual therapy, group therapy, family therapy, and preventive medication counseling services provided to Yarushka, submitting claims under service codes 90801, 90806, 90847, 90853 and

20

99404.  Three of these service codes, 90806, 90847 and 90853, required the

person who provided the therapy to meet the qualifications and

supervision requirements of 130 Mass. Code Regs § 429.424.  *See* Section B.,

*infra.* None of the UHS staff members who provided such services met

those requirements.  JA 45-47, 49 (SAC ¶¶ 41–46, 48–50, 58–63, 73, 75, 78).

Nor did UHS comply with Mass Health's supervision requirements for any

of the persons who treated Yarushka.  JA 46–47, 49, 53 (SAC ¶¶ 50, 63, 78,

111–12).  All claims it submitted for service provided to Yarushka were

paid by MassHealth.  However, had MassHealth known that the staff who

billed for these services had been unlicensed and unsupervised,

MassHealth would not have paid.  JA 68, 70, 72, 73, 75, 77, 79, 81, 83, 86, 86,

88, 89, 92 (SAC ¶¶ 209, 223, 237, 251, 263, 275, 292, 305, 318, 331, 343, 354,

363 and 378).

Yarushka's death caused the Relators to investigate the treatment she

had received.  They discovered that UHS systematically failed to employ

mental health care professionals who met MassHealth's licensing or

qualification requirements, and failed to provide the mandated supervision

that would permit UHS to provide effective and quality care to MassHealth beneficiaries.  JA 53–66 (SAC ¶¶ 114–196).

As part of their investigation, Relators learned that one of the unlicensed clinicians who had treated Yarushka, Maria Pereyra, had obtained a National Provider Identification ("NPI") number that falsely identified her as a licensed social worker.  All individuals who bill federal programs administered by the Center for Medicare and Medicaid Services ("CMS") must obtain NPI numbers, which identify the licenses that individual providers hold.  JA 59-60 (SAC ¶¶ 154-156).

Relators did further research and found that Pereyra was not the only UHS employee with a false NPI number.  By comparing the NPI database with the lists of licensed professionals maintained by the Commonwealth, Relators discovered that 22 UHS employees who worked at the Lawrence Clinic held NPI numbers that falsely identified the employees as licensed social workers or licensed mental health counselors.  None of these UHS employees were licensed to practice social work or provide psychotherapy. JA 59–60 (SAC ¶¶ 155–156).

Relators filed complaints with the Massachusetts Division of Professional Licensure ("DPL") and Massachusetts Department for Public Health ("DPH") based on the information they uncovered. JA 56 (SAC ¶¶ 134, 137). Relators' complaint spurred an independent investigation by DPH. JA 276. In April 2012, DPH found that UHS employed at least 23 unlicensed mental health counselors at the Lawerence clinic who had provided mental health therapy without supervision. JA 64 (SAC ¶ 184). Although the DPH investigation determined that UHS's operation of its Lawrence clinic violated numerous regulations administered by DPH, the investigation did not conclude that any MassHealth regulations had been violated. JA 276–95.

DPH also determined that UHS had failed to adequately staff the Lawrence clinic with a board-certified or board-eligible psychiatrist, as required by Massachusetts law, because the clinic's sole physician, had failed the board certification examination 20 years earlier. JA 64–65 (SAC ¶¶ 186–88). DPH regulations provide that every "clinic providing mental health services" must employ a board-certified psychiatrist, or one who is eligible for board certification. 105 Mass. Code Regs. § 140.530. DPH

23

regulations also provide that "[a] satellite clinic must meet [this requirement] independently of its parent clinic." 105 Mass.Code Regs. § 140.330. If MassHealth had known that UHS's sole physician was neither board-certified nor board-eligible, MassHealth would not have paid the claims that UHS submitted for medical services that were not supervised by a medical director or a board-certified or board-eligible psychiatrist. JA 79, 92 (SAC ¶¶ 292, 378).

## SUMMARY OF THE ARGUMENT

This case has been remanded by the Supreme Court of the United States to determine in the first instance whether the Relators' Second Amended Complaint sufficiently alleges that the implicit misrepresentations made by UHS were material. The definition of materiality used to evaluate the allegations of the Relators' complaint is substantially similar to the standard of materiality this Court has applied in other cases involving fraud based misconduct under other federal fraud statutes. The appropriate standard is whether the false information

communicated by UHS was sufficiently important to influence the decision of MassHealth to pay the claims at issue.

Although the Supreme Court was uncertain that this Court applied the proper materiality analysis when the case was previously before it, this Court has previously applied the materiality concepts discussed by the Supreme Court in False Claims Act cases.  This Court did not automatically conclude that the regulatory requirements were material simply because they were conditions of payment; it examined the importance of the regulations to MassHealth's regulatory scheme, and the fact that the requirements were "express and absolute," as opposed to a mere option to decline payment.  Thus, this Court may well have performed the materiality inquiry expected by the Supreme Court, and if so, it should once again find that the misrepresentations identified in the Relators' complaint are material.

The Supreme Court recognized that the Relators' complaint alleges that UHS misrepresented its compliance with requirements so central to the provision of the mental health services that MassHealth would not have paid the claims had it known the truth.  These allegations and at least

25

four other factors establish the materiality of the misrepresentations at issue. These factors are:

- <u>The importance of the qualifications and supervision requirements to the services being purchased by MassHealth</u>: MassHealth had the right to establish minimum requirements to ensure that the services provided by UHS meet MassHealth's quality of care requirements.  Failing to provide licensed, qualified therapists goes to the essence of the contract between UHS and Mass Health.

- <u>The regulatory scheme</u>:  The regulatory scheme demonstrates how central the qualifications and supervision requirements were to MassHealth, and also establishes that compliance with these requirements were conditions of payment.  Where MassHealth's regulations required providers to comply with these requirements in order to receive reimbursement, providers were on notice that MassHealth had established a policy where it would deny payment in the absence of compliance in "the mine run of cases."  Circumstances that

26

might cut against materiality notwithstanding MassHealth's
deliberate creation of conditions of payment do not apply here.
The regulatory requirements at issue are not minor or garden
variety, and MassHealth did not indiscriminately identify
regulatory requirements as conditions of payment.

- <u>The service codes</u>:  Most of the service codes for which UHS
sought reimbursement explicitly required compliance with 130
Mass. Code Regs. § 429.424, the regulation that set forth
minimum requirements for treating therapists and set forth
many of the supervision requirements at issue.

- <u>UHS's efforts to conceal that its therapists were not licensed</u>:
Numerous UHS employees who treated patients at UHS's
Lawrence facility misrepresented that they were licensed in
their applications for NPI numbers, a unique identifier every
person who seeks to bill federal programs for medical services
must obtain.  If the unlicensed status of its employees was
unimportant to the payment decision, as UHS asserts, there
was no reason for UHS hide it.  That fact that UHS employees

27

deliberately and routinely falsified their applications is

evidence that UHS realized the true facts were material and

that MassHealth's knowledge of the truth would have likely

influenced its payment decisions.

The above allegations raise issues of fact regarding whether the

misrepresented facts were material to MassHealth, and consequently

satisfy the materiality inquiry at the pleading stage.

This conclusion is not foreclosed by the possibility that MassHealth

had actual knowledge of UHS's violations when it paid the relevant claims.

Although the payor's actual knowledge may be evidence that the

representations were not material to the payor, ordinarily such a matter is a

question of fact that must be decided on a complete factual record, as

opposed to the allegations of the relator's complaint.  Here, at most, the

allegations of the complaint evidence that other branches of the

Commonwealth of Massachusetts had knowledge of UHS's violations.

However, such knowledge cannot be imputed to MassHealth for the

purpose of establishing MassHealth's actual knowledge.  And even if

MassHealth had actual knowledge, such knowledge is not dispositive; it

merely raises a factual issue that may be rebutted on a full evidentiary record.

If the Court finds that the allegations of the Second Amended Complaint do not satisfy the materiality standard identified by the Supreme Court, the case should be remanded with instructions that the Relators be given leave to amend.  The Second Amended Complaint was drafted in light of this Court's precedents and this Court recognized that the Complaint complied with the existing rules in this circuit.  If a new standard is applicable, and if the current complaint does not meet it, Relators should be given an opportunity to meet the contours of the new standard.  Additional allegations relevant to a materiality inquiry could be added to an amended pleading.

## ARGUMENT

Having articulated guidelines for evaluating the materiality of implied misrepresentations in federal False Claims Act ("FCA") cases, the Supreme Court has remanded the case to this Court for further proceedings consistent with its opinion.  This is the Supreme Court's

29

"ordinary practice" when it has promulgated a new legal standard that it

believes the lower court did not apply. *Omnicare, Inc. v. Laborers Dist.*

*Council Constr. Industry Pension Fund*, ___ U.S. ___, 135 S. Ct. 1318, 1333

(2015). Consequently, this Court is tasked with determining whether the

Relators' complaint meets the materiality standard identified in *Escobar II*,

and, if not, whether the Relators should be given a chance to replead.

The Supreme Court acknowledged that the materiality standard to be

applied to alleged violations of 31 U.S.C. §3729(a)(1)(A) was "familiar."

*Escobar II*, 136 S. Ct. at 2004, n.6. It has been derived from the common law

and is essentially the same materiality standard applied to other federal

fraud statutes. *Id*. at 2002-03. Indeed, this Court has repeatedly applied

these principles to common law fraud claims,[7] federal fraud statutes,[8] and

even FCA cases.[9]

---

[7] *See, e.g., Rodowicz v. Massachusetts Mut. Life Ins. Co.*, 192 F.3d 162, 174 (1st Cir. 1999) ("the basic standard of materiality is . . .whether a reasonable man would attach importance to the facts not disclosed in determining his choice of action in the transaction in question," internal quotation and citation omitted).

[8] *See, e.g., United States v. Prieto*, 812 F.3d 6, 13 (1st Cir. 2016) (statements are material if they "had a natural tendency to influence, or [are] capable of

30

Under this well-established standard, where the Relators have alleged misrepresentations of "compliance with the provision of the mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid" had it known of the violations, *id.*, 136 S. Ct. at 2004, there should be little question that the Relators have satisfied the FCA's pleading requirements for materiality. The Court should rule that the Relators' Second Amended Complaint states viable claims for violation of the federal and Massachusetts False Claims Acts, and remand it to the district court for further proceedings.

In the event, however, that this Court interprets the Supreme Court's opinion to require allegations that go beyond the usual requirements for pleading materiality under federal fraud statutes, this Court should grant the Relators leave to amend their complaint to meet the previously

influencing, the decision of the decisionmaking body to which [they were] addressed," internal quotations omitted).

[9] *See*, *e.g.*, *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010) ("[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed," internal quotation and citation omitted).

31

unforeseen pleading requirements.  Granting leave to amend would not be

futile because, as demonstrated below, the Relators can add additional

factual allegations that should allow them to meet the materiality

requirements identified by the Supreme Court.

This Court still has before it a complaint which was dismissed for

failure to state a cause of action under Fed. R. Civ. P. 12(b)(6).  The

standard of review is de novo.  *College Hill Properties LLC v. City of*

*Worcester*, 821 F.3d 193, 195 (1st Cir. 2016).

## I.     THE RELATORS' COMPLAINT SATISFIES THE FCA'S MATERIALITY PLEADING REQUIREMENT IF IT CONTAINS PLAUSIBLE FACTUAL ALLEGATIONS THAT UHS MISREPRESENTED INFORMATION SUFFICIENTLY IMPORTANT TO INFLUENCE MASSHEALTH'S PAYMENT DECISIONS

### A.     UHS's Misrepresentations to MassHealth are Material if They Would Have Been Sufficiently Important to Influence MassHealth's Payment Decisions.

Even before this Court received the judgment of the United States

Supreme Court in this matter, it was required to determine what type of

facts are "material" under the FCA and the standards identified by the

Supreme Court in *Escobar II*.  Relying upon *Escobar II*, this Court ruled that

32

when examining the question of materiality the "relevant inquiry" is "whether a piece of information is sufficiently important to influence the behavior of the recipient." *United States ex rel. Winkelman v. CVS Caremark Corp.*, ___ F.3d ___, 2016 WL 3568145, *8 (1st Cir. 2016) (analyzing when an alleged original source's complaint "materially adds" to publicly disclosed allegations under 31 U.S.C. § 3730(e)(4)(B)(2)). The same standard should be used to determine whether the SAC adequately pleads materiality here.

In *Escobar II*, the Supreme Court recognized that materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002, *citing* 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003). Citing with favor the Restatement (Second) on Torts, § 538 (1977), it held that in the tort context a matter is "material" if "a reasonable man would attach importance to [it] in determining his choice of action in the transaction." *Escobar II* at 2003. Alternatively, representations are material "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action' even though a reasonable person would not." *Id.*, *quoting* Restatement (Second) of Torts, § 538 at 80.

33

Footnote 5 of *Escobar II* identifies additional formulations of the

materiality inquiry. *Id.* at n.5. "[A] misrepresentation is material if, had it

not been made, the party complaining of fraud would not have taken the

action alleged to have been induced by the misrepresentation." *Id.*, *quoting*

Williston § 69:12, p. 550. Alternatively, a misrepresentation is material if it

went to the very essence of the bargain. *Escobar II* at n.5, *citing Junius*

*Constr. Co. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672, 674 (1931) (Cardozo, J.).

A third standard, derived from the Supreme Court's own jurisprudence as

well as § 538 of Restatement (Second) of Torts, is whether the information

has "a natural tendency to influence, or [is] capable of influencing, the

decision of the decisionmaking body to which it was addressed." *Neder v.*

*United States*, 527 U.S. 1, 16 (1999) (alteration in original); *see Escobar II* at

n.5.

The last formulation has particular relevance because it is almost

identical to the definition of "material" found in the FCA: "having a

natural tendency to influence, or be capable of influencing, the payment or

receipt of money or property," 31 U.S.C. § 3729(b)(4). The Supreme Court

recognized that the definition found within the FCA, its approach to

34

materiality in connection with other federal fraud statutes, and the common law's concept of materiality are entirely consistent. *See* 136 S. Ct. at 2002. The materiality inquiry applied to claims brought under 31 U.S.C. §3729(a)(1)(A), therefore, is not significantly different than that applied in other common law fraud or statutory fraud contexts. *Id.*

This Court's definition of materiality in *Winkelman*—that the information be "sufficiently important to influence the decision of the recipient"—concisely synthesizes all of these factors. It is, consequently, an appropriate standard to use in evaluating the Relators' complaint.

**B.    This Court's Materiality Analysis in *Escobar I* May Be Consistent with the Supreme Court's Instruction.**

This Court is familiar with the materiality standard applied in federal fraud cases generally, and its consistent application of those principles in prior FCA cases.[10]  S*ee Jones ex rel. United States v. Mass. Gen. Hosp.*, 780 F.3d

---

[10] As noted in footnote 9, *supra,* in *Longhren*, this Court observed that a representation was material "if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Longhren* , 613 F.3d at 307, *quoting Neder v. United States,* 527 U.S. 1, 16 (1999) and *United States v. Gaudin*, 515 U.S. 506, 509 (1995). This standard, of course, is the same cited by the Supreme Court in *Escobar II.*

479, 496 (1st Cir. 2015); *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d at 307.  For that reason, it is quite possible that this Court performed the appropriate materiality analysis when it reviewed this case originally.

The Supreme Court, of course, remanded the case because it did not believe this Court interpreted the FCA materiality requirement consistent with its views.  The Supreme Court was under the impression that the Court found UHS's false representations material because UHS knew that MassHealth "would be entitled to refuse payment were it aware of the violation." *Escobar II*, 136 S. Ct. at 2004.   It may also have understood this Court's position to be that materiality was automatically established once this Court found compliance with the supervision requirements to be a condition of payment.  Such a position is inconsistent with the Supreme Court's firm instruction that materiality cannot rest on a single fact or occurrence.  *Id.* at 2001, *quoting Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39 (2011).  Yet a review of this Court's grounds in its original decision for finding sufficient allegations of materiality shows that this Court's review was more comprehensive and nuanced than either of the above characterizations.

36

This Court's discussion of the materiality of UHS' misrepresentations of compliance with MassHealth's supervision requirements is both concise and complete.

> These counts also have properly pleaded that the condition of payment at issue was a material one. The express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory scheme, "'constitute dispositive evidence of materiality.'"

*Escobar I*, 780 F.3d at 514–15 (internal citations omitted).

The first sentence makes it clear that this Court did not equate misrepresentation of a condition of payment with a material misrepresentation; even when a condition of payment had been violated, further analysis was necessary to determine whether the condition was "material." Here the condition of payment was material for at least two reasons: (1) the "express and absolute" language in the regulation; and (2) the repeated references to supervision in the regulatory scheme.

The first factor indicates that this Court did not find the violations to be material merely because their violation gave MassHealth an option to

37

seek repayment. The Court found the requirement was "absolute."[11]   UHS

had no right to receive reimbursement (and MassHealth was not supposed

to pay reimbursement) unless there was compliance with the underlying

regulation. The mandatory nature of the requirement was highlighted by

the language from the regulation this Court emphasized in its analysis. It

quoted the portion of 130 Mass. Code Regs. § 429.439 that recites that

services "are reimbursable *onl*y if the program meets the standards

described below" (emphasis added). Where compliance with a regulation

that must be properly performed in order to receive compensation is

misrepresented, clearly the information was sufficiently important to have

likely influenced the decision of the recipient to pay or not pay.

The second factor the Court relied upon was the repeated references

to supervision throughout Chapter 429. This repeated reference goes to the

centrality of the representation, and its likely importance to MassHealth.

Where certain conduct is not only an express condition of payment, but is

_____

[11] The requirement was also "express," which means that UHS knew that
the recipient of the representation attached importance to the specific
matter in determining his choice of action in the transaction.

so important as to be central to the entire regulatory scheme, clearly failure to comply goes to the essence of the parties' bargain and exchange. It is strong evidence of what was important to MassHealth and what the agency expected to receive for its payments. Again, it is more than reasonable to infer that failure to comply with such a requirement would have a natural tendency to influence MassHealth's payment decision.

Thus, it may be that this Court has already performed the complete materiality inquiry the Supreme Court has requested, examining the very factors the Supreme Court subsequently elucidated. In such a case, this Court's prior finding of materiality should not be altered. The same analysis performed on the same complaint will yield the same result—UHS's misrepresentations were material.

Relators, of course, may be mistaken as to what this Court previously considered. Or the Court may believe that in light of the Supreme Court's mandate, it should perform a de novo review to make sure that the materiality requirement has been met. Accordingly, Relators will review all the relevant factors, which establish overwhelmingly that UHS's failure

to comply with MassHealth's qualifications and supervision requirements

for mental health staff was material to its payment decisions.

## II.     THERE IS A SUFFICIENT BASIS TO FIND THAT HAD MASSHEALTH BEEN AWARE OF UHS'S FAILURES TO STAFF ITS CENTERS WITH QUALIFIED STAFF OR PROVIDE APPROPRIATE SUPERVISION, IT WOULD NOT HAVE PAID THE CLAIMS AT ISSUE.

This Court's analysis should start with the Supreme Court's last

words concerning the allegations in the Relators' complaint:

> Respondents have alleged that Universal Health
> misrepresented its compliance with mental health facility
> requirements that are so central to the provision of mental
> health counseling that the Medicaid program would not have
> paid these claims had it known of these violations.

*Escobar II*, 136 S. Ct. at 2004.

These words are not a statement of what this Court must yet find in

the SAC to allow the case to go forward; it is a definitive, binding ruling

regarding the content of the well-pleaded allegations in the existing

complaint.  Assuming the complaint's allegations are true, as this Court

must when reviewing it under Fed. R. Civ. P. 12(b)(6), the only question for

this Court is whether such information would have been sufficiently

important to influence MassHealth's decision to pay.  Clearly, the answer must be "Yes."

There are at least four bases for the Court to find that UHS's false representations that it had complied with MassHealth's qualifications and supervision requirements were material and had a natural tendency to influence the decision to pay the false claims at issue: (1) the nature of the services to be provided by UHS and what MassHealth expected to receive for its money; (2) the regulatory framework which expressly, repeatedly and intentionally made compliance with the qualifications and supervision requirements a condition of payment; (3) the terms of the actual service codes pursuant to which UHS sought reimbursement from MassHealth; and (4) UHS's efforts to conceal its fraud from MassHealth.  Relators will examine each of these in turn.

### A.    The Provision of Qualified and Supervised Mental Health Workers Was Essential to That for Which MassHealth Contracted and Paid

The payments at issue were supposed to be for professional mental health care services.  MassHealth is required to provide mental health care to eligible recipients, and it contracts with providers, such as UHS, to

41

provide those services to its members.  Plainly, when MassHealth

contracted with UHS for professional mental health services, it expected

that its members would get services provided by qualified professionals.

Having such services provided by persons who do not meet the minimum

qualifications or necessary supervision specified by MassHealth clearly

undermines what MassHealth expected to receive for its money and would

have a natural tendency to influence its payment decision.

When a governmental entity purchases goods or services from a

third party, there can be no doubt that the entity has the right to specify the

quality of goods or services it expects to receive.  In the goods context, this

is often accomplished by product specifications that spell out the quality of

the materials and workmanship to be provided in order for the vendor to

be paid the contracted price.  When a governmental entity purchases

services, however, particularly medical or mental health services, quality

cannot be assured through detailed product specifications.  One cannot

place an order for industrial grade group therapy at a specified width,

depth and height.

In the services milieu, one of the few ways to assure the services contracted meet the agency's quality requirements is to specify the qualifications of the persons who will actually perform the services. The government agency, in this case MassHealth, specifies the minimum experience, licensing or certification requirements and/or the necessary supervision by qualified supervisors to assure the services ultimately provided will most likely meet the level of quality required by the agency. Qualifications and supervision requirements go directly to assuring that the services provided meet the minimum level of quality required.

Viewed in this light, it will be rare indeed when the purchaser's payment decision is not influenced by the vendor's compliance with the specified qualifications requirements. Although the Supreme Court cautions that non-compliance with a "minor or insubstantial" contract requirement will not meet the FCA's materiality requirement, *Escobar II,* 136 S. Ct. at 2003, the quality of the services to be provided goes to the heart of what MassHealth contracted to receive. In the terms of the hypothetical described at the conclusion of *Escobar II,* MassHealth's qualifications and supervision specifications are not the equivalent of a

43

tacked on requirement that providers use American-made staplers.  *See id.* at 2004.

Providing mental health services through unqualified counselors is no better than UHS having its Medicaid patients tell their troubles to the neighborhood bartender.  Both "providers" may lend a sympathetic ear to MassHealth members, but neither are qualified to treat mental illness.  The compliance failure goes to the essence of the contract.  It is more than plausible that such non-compliance would be material to MassHealth.

### B. UHS's False Claims Concern Conditions of Payment That Were Not Insignificant and Which MassHealth Would Likely Enforce

#### 1. The qualification and supervision requirements are central to MassHealth's provision of quality mental health services to its members, and meeting these requirements are conditions of payment.

The Relators' complaint alleges that MassHealth has established quality of care requirements for participating mental health facilities that must be met before a mental health provider will be reimbursed.  JA 41 (SAC ¶ 9).  Central to these quality of care pre-conditions are the minimum qualifications requirements for treating mental health care professionals, which are set forth in 130 Mass. Code Regs. § 429.424, and the supervision

44

requirements for these mental health care providers, which are set forth in various regulations under Chapter 429, including §§ 429.423, 429.424, 429.437 and 429.439.  JA 41 (SAC ¶¶10, 12).  The question, of course, is whether compliance with these regulatory requirements is material to MassHealth.

The best way to determine what is significant to MassHealth's payment decisions is to examine its official statements, including its regulations.  Indeed, one of the rationales for the position UHS took before the Supreme Court—that only false certifications of conditions of payment expressly set forth in statutes or regulations could be the basis of an FCA violation—is that only if the state agency expressly identifies specific regulatory requirements as conditions of payment is it possible to discern which regulations are material to payment decisions.   *See*, *e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 793 (characterizing the need for an express condition of payment as a "heightened materiality requirement").

Although this Court foresaw that conditions of payment did not need to be expressly stated in a regulation in *Escobar I*, it also recognized that

45

examination of the regulatory scheme is highly relevant to determining whether the alleged non-compliance was material to the agency's payment decision. 780 F.3d at 514. Here, review of MassHealth's regulatory scheme for mental health centers leaves no doubt that these requirements are conditions of payment critical to the regulatory scheme and MassHealth's administration of it.

To a large extent, this is ground this Court has already covered. In *Escobar I*, this Court closely examined how the qualifications and supervision requirements set out in § 429.424 were entwined with the requirements for the management of satellite mental health centers under § 429.439, and the obligation of a satellite's clinical director to ensure that all staff were properly and adequately supervised under § 429.423. 780 F.3d at 513–14, 516. As described above, the centrality of these requirements—that "there are repeated references to supervision throughout the regulatory scheme," *id.* at 514— was an important factor that led the Court to conclude that UHS's misrepresentations were material. *See* Section I.B, *supra.*

46

But the centrality of these requirements may be even greater than the Court appreciated.  There are only 27 regulations in Chapter 429, the chapter of the Code of Massachusetts Regulations that sets forth all of MassHealth's regulations for mental health centers, and yet those regulations contain no less than 17 references to staff at mental health centers meeting the minimum qualification requirements established by §429.424.  The most important reference to § 429.424 is §429.441(A)(1), which states in relevant part:

> The MassHealth agency pays for diagnostic and treatment services *only when a professional staff member, as defined by 130 CMR 429.424*, personally provides these services to the member or the member's family . . . (emphasis added)

(emphasis added); s*ee also*, 130 Mass. Code Regs. § 429.421(A)(2) ("All services must be clinically determined to be medically necessary and appropriate, and must be delivered by qualified staff in accordance with 130 CMR 429.424.").[12]

---

[12] Relators acknowledge that neither §429.421 nor § 429.441 are referenced in the Second Amended Complaint.  This Court, however, can take judicial notice of state regulations and publicly available state regulatory material. *Ms. S v. Regional School Unit 72*, ___ F.3d ___, 2016 WL 3854470, *4, n.4. (1st Cir., July 15, 2016).

Other supervision requirements are also repeatedly referenced in

MassHealth's mental health center regulations. In addition to the

references in 130 Mass. Code Regs. § 429.423(B) (describing the

responsibilities of Director of Clinical Services) and § 429.439 (describing

the operations of Satellite Programs), both of which the Court discussed in

*Escobar I*, there are additional requirements relating to staff supervision in

§ 429.422 (Staff Composition Requirements), § 429.437 (Written Policies and

Procedures), § 429.438 (Administration)[13] and § 429.441 (Service Limits).

These regulations confirm this Court's finding that the qualifications

and supervision requirements are conditions of payment. *Escobar I,*

780 F.3d at 514. They also satisfy the more exacting materiality inquiry. As

this Court noted in connection with its analysis of § 429.439 in *Escobar I*, the

---

[13] Section 429.438(E)(1), detailing how supervision must occur, has
particular relevance.

> Each staff member must receive supervision appropriate to the
> person's skills and level of professional development.
> Supervision must occur within the context of a formalized
> relationship providing for frequent and regularly scheduled
> personal contact with the supervisor. Frequency and extent of
> supervision must conform to the licensing standards of each
> discipline's Board of Registration, as cited in 130 MASS. CODE
> REGS. 429.424.

mandatory qualifications requirements and related supervision requirements established by § 429.441(A) are "express and absolute."  *See Escobar I* at 514.  Section 429.441(A) restricts reimbursement to "when a professional staff member, as defined by 130 CMR 429.424, personally provides these services."  130 Mass. Code Regs. § 429.441(A).  UHS must meet the condition precedent to legally receive payment.  No clearer statement that compliance influences MassHealth's payment decision could be made.

In *Escobar II*, the Supreme Court stated "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  136 S. Ct. at 2003.  The MassHealth regulations establish that MassHealth had formally established a policy to not pay such claims and that UHS had knowledge of MassHealth's refusal to pay.  At a minimum, Relators can establish materiality through the non-exclusive method identified by the Supreme Court above, and their pleading should be found to be sufficient.

49

2.    <u>This case does not fall into the narrow category of cases in which an express condition of payment is not material.</u>

The Supreme Court stated that a government agency's decision to expressly designate a provision as a condition of payment is "relevant, but not automatically dispositive." *Escobar II,* 136 S. Ct. at 2003.  Relators expect UHS will rely on this language to argue that the Relators cannot rely on the language of a regulation to establish materiality, but must show something more.  Such an argument overstates the showing Relators need to make at the pleading stage.

When the Supreme Court stated that an express condition of payment is not "*automatically* dispositive," it implicitly acknowledged that in many cases (but not all) such a condition will be dispositive.  *Escobar II*, 136 S. Ct. at 1995 (emphasis added).  In its discussion the Court cataloged those circumstances where the regulatory requirement may not be material, notwithstanding the existence of an express statement of condition.  These are when:  (1) the failure to comply concerns a "garden-variety" breach of contract or regulatory violation; (2) the designation is *pro forma*; (3) the payor has a mere "option to decline to pay" upon the contracting party's non-compliance; and (4) where the non-compliance is

50

"minor or insubstantial." *Escobar II*, 136 S. Ct. at 2003. None of these circumstances are present here.

The Supreme Court itself has recognized that this case does not involve a garden variety regulatory violation or a minor or insubstantial matter. It characterized the violations alleged by the Relator's complaint to be "so central to the provision of mental health counseling that the Medicaid program would not have paid these claims." *Id.* at 2004.

Nor could MassHealth's deliberate decisions to make the qualifications and supervision requirements conditions of payments be found to be *pro forma*. Chapter 429 does not indiscriminately define the regulatory requirements therein to be conditions of payment. Indeed, very few provisions of the Chapter condition reimbursement on compliance.

Finally, the "express and absolute" language of the regulations make it clear that these requirements do not merely provide MassHealth with an option to decline to pay upon the discovery of non-compliance. Sections 429.441(A) and 429.439 state their requirements in unyielding terms: if there is no compliance, there will be no payment. MassHealth has not

authorized any other option.  It is clear that the conditions of payment are material.

### C.    The Service Codes in the Claims Submitted by UHS Required Compliance with the MassHealth's Qualifications and Supervision Requirements.

In addition to MassHealth's formal regulations, the definitions of the service codes at issue in this case demonstrate that compliance with the qualifications and supervision requirements were material.

The false claims in this case were presented when UHS filed claims with MassHealth containing service codes that identified various mental health services UHS represented it had provided to MassHealth members. Specifically, the complaint alleges that UHS filed false claims under service codes 90806, 90847 and 90853.  JA 45–47, 49 (SAC ¶¶ 41 -49, 58-62, 73-76). The Second Amended Complaint identifies these codes as signifying the provision of individual therapy, family therapy, and group therapy.  JA 45–47 (SAC ¶¶ 41, 48 and 58).  But, in fact, the definition of these codes, and what UHS had to provide in order to properly bill under these codes,

is more detailed.  At the relevant time[14], Section 601 of MassHealth's

Mental Health Center Manual defined these codes as follows:

> 90806          Individual psychotherapy, insight oriented,
>                behavior modifying and/or supportive, in an
>                office or outpatient facility, approximately 45 to 50
>                minutes face-to-face with the patient (*by*

---

[14] The definitions of these codes were in effect between 2008 and 2014.  A
copy of Section 601 of the Mental Health Center Manual, as it was in effect
at that time, is available in MassHealth Transmittal Letter MHC-39, dated
January 2009, a copy of which is located at
www.mass.gov/eohhs/docs/masshealth/transletters-2009/mhc-39.pdf.

The definitions of the service codes were amended in 2014, as evidenced by
MassHealth Transmittal Letter MHC-47, dated April 2014, a copy of which
is located at www.mass.gov/eohhs/docs/masshealth/transletters-
2014/mhc-47.pdf.  In 2014, the references to 130 Mass. Code Regs. § 429.424
were removed from the definitions of service codes 90806, 90847 and
90853.  At the same time, however, the title of 130 Mass. Code Regs. §
429.424 was changed from "Qualifications of Staff by Core Discipline" to its
current title, "Qualifications of Professional Staff Members Authorized to
Render Billable Mental Health Center Service by Core Discipline."  The
change in title evidences that even though an explicit reference to 130 Mass.
Code Regs. § 420.424 was removed from some of the billing codes,
MassHealth still intended only to permit professional staff members who
met the qualifications and supervision requirements of §429.424 to be able
to bill for mental health services.

This Court can take judicial notice of all regulatory materials that are made
available to the public.  *Ms. S v. Regional School Unit 72*, ___ F.3d ___, 2016
WL 3854470, *4, n.4. (1st Cir. July 15, 2016).

> *professional staff member as defined in 130 CMR 429.424*)

90847    Family psychotherapy (conjoint psychotherapy) (with patient present) (*by professional staff member as defined in 130 CMR 429.424*)

90853    Group psychotherapy (other than of a multiple-family group) (*by professional staff member as defined in 130 CMR 429.424*)

MassHealth Mental Health Manual, § 601 (emphases added).

Thus, when UHS filed its claims to be paid for individual, family and group therapy, it was not just implicitly certifying compliance with the qualifications and supervision requirements of § 429.424, it was expressly certifying compliance. Further, such compliance was so critical to MassHealth that the agency defined the very service that allowed providers to receive compensation as compliance with § 429.424. By definition, a provider had not performed the service identified by the specified codes unless the persons who billed for the service also met the requirements of §429.424. Finally, as with the language in the relevant regulations, the definitions of the service codes put UHS on notice that MassHealth had established a policy of not paying compensation "in the mine run of cases" when the provider has violated the qualification and

supervision requirements established by § 429.424.  Evidence of such

knowledge by UHS is sufficient to establish that its misrepresentations

were material.  *Escobar II*, 136 S. Ct. at 2003.

When the entity which makes the payment decisions defines the task

for which reimbursement is to be paid as including compliance with a

specific regulation, it is impossible to reach any other conclusion than

compliance with the specified regulation is material to the decision maker.

### D.    UHS's Concealment of the Fact That its Therapists Were Unlicensed Evidences the Materiality of its Misrepresentations

UHS contends it was no big deal that many of its counselors and

psychologists were not properly licensed and that MassHealth would have

paid anyway had it known the truth.  This contention is belied by the fact

that UHS concealed its failure to comply.

Relators' complaint describes a disturbing pattern in connection with

UHS staff members' National Provider Identification ("NPI") numbers.

NPI numbers provide a unique identifier to each health care practitioner

who bills under any government program, including Medicaid, and are

included in every claim for payment submitted to MassHealth (or any

other health insurance program overseen by the United States Department

55

of Health and Human Services).  NPI numbers also identify the

practitioner's level of expertise and whether the practitioner is actually

licensed.  JA 57 (SAC ¶¶ 139-40).

The Relators discovered that Maria Pereyra, one of the UHS

unlicensed counselors who treated their daughter (and who the Relators

allege did not have the minimum qualifications to bill for mental health

services under §429.424), not only misrepresented her qualifications to

them, but had obtained an NPI number that misrepresented that she was a

licensed social worker.  JA 56–57 (SAC ¶¶ 138, 141).  This was not an

isolated occurrence.  The Relators did further research and discovered that

an additional 22 UHS employee's had obtained false NPI numbers that

misrepresented their status as licensed social workers or licensed mental

health counselors.  JA 59–60 (SAC ¶¶ 153-56).

Drawing all reasonable inferences from the complaint in the Relators'

favor, this Court can plausibly conclude that the misrepresentation of the

licensed status of more than a score of UHS employees was not an accident,

and that UHS participated in the widespread deception.  This deceit

completely undercuts UHS's argument that the employees' unlicensed

status would not be material to the persons deciding whether to pay UHS's

claims for therapy provided by the unlicensed staff.  If the staff's

unlicensed status was unimportant to the decision to pay, there would be

no reason to conceal it.  Conversely, the decision to engage in deceit

evidences UHS's knowledge that the misrepresented information was

material and supports the conclusion that the decision maker would have

been influenced had it known the true facts.

　　　Although UHS's concealment of the truth has particular relevance to

whether it acted "knowingly" under the FCA, this Court has recognized

that in fraud cases scienter and materiality are "related requirements,"

*Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5, 20 (1st Cir. 2011), and

that what the communicating party knows and when it knew it is

"pertinent both to materiality and to scienter." *Miss. Pub. Emps. Ret. Sys. v.*

*Bos. Sci. Corp.*, 523 F.3d 75, 86–87 (1st Cir. 2008).  Indeed, the Supreme

Court held in *Escobar II* that:

> proof of materiality can include, but is not limited to, evidence
> that the defendant knows that the Government consistently
> refused to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory or
> contractual requirement.

136 S. Ct. 2003.  UHS's concealment is evidence that UHS had such knowledge.

In summary, the nature of the services being purchased from UHS, the importance of the qualifications and supervision requirements to the regulatory scheme, the service codes of the services for which UHS sought reimbursement, and UHS's knowing efforts to conceal the actual status of the persons providing the mental health therapy, individually and together, give rise to the plausible conclusion that UHS's misrepresentations of compliance were material to MassHealth.


## III.   WHETHER MASSHEALTH PAID CLAIMS WITH ACTUAL NOTICE OF UHS'S NON-COMPLIANCE IS A QUESTION OF FACT THAT CANNOT BE DETERMINED AT THIS STAGE

In *Escobar II* the Supreme Court identifies a number of factors which courts should evaluate and balance in making a determination whether a misrepresentation is material in FCA cases.  One of these, which UHS will likely raise, is whether MassHealth paid claims with actual knowledge of UHS's regulatory violations.  *Escobar II*, 136 S. Ct. at 2003-04. While such knowledge might be some evidence that the regulations at issue were not

58

material, the assertion of such a defense will often raises issues of fact that cannot be decided at the pleading stage. The potential defense certainly provides no basis for dismissing the Relators' Second Amended Complaint.

In its summary of the various ways parties to an FCA action might prove or disprove materiality, the Supreme Court observed that if a government payor paid "a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position," such actions would constitute "strong evidence" of non-materiality. *Escobar II*, at 2003-04 (emphases added). By such language the Supreme Court recognized an initial showing of materiality may raise a factual issue that a defendant can rebut by focused evidence establishing that disclosure of the regulatory violations would not have influenced the payment decisions. But establishing the defense is at least as demanding as the FCA materiality requirement itself.

First, the Supreme Court requires "actual knowledge that certain requirements were violated." *Id.* It is significant that the Court required "actual knowledge," not simply "notice." Thus, establishing that the agency had knowledge of unverified allegations of misconduct is

59

insufficient; the agency must actually know of the violations.  It must then take actions inconsistent with the knowledge that the requirements were violated.

Second, even if a defendant could satisfy the actual knowledge and subsequent inconsistent action requirements, such evidence is not dispositive; it is only "strong evidence."  Again, the distinction made by the Supreme Court was deliberate.  The Court's entire discussion of materiality under the FCA is based on the premise that materiality cannot rest on a single fact or occurrence as being always determinative.  *Escobar II,* 136 S. Ct. at 2001.  Its citation to *Matrixx Initiatives,* 563 U.S. at 39, is particularly instructive, for there the Court confirmed that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive," *quoting Basic, Inc. v. Levinson,* 485 U.S. 224, 236 (1988).

Thus, the agency (or a relator in the payor's stead) can rebut the defendants' counter showing by presenting its own evidence as to why the misrepresentations were material notwithstanding seemingly inconsistent

behavior.   There are various reasons that an agency like MassHealth might

continue to pay claims even with actual knowledge of violations.  These

include that the agency may have reason to believe that prior misconduct

has ceased; that the regulatory violations may not affect every claim

submitted by the provider and the agency's claims processing system is

unable to distinguish between valid claims and tainted claims; or because

the provider's provision of services to a certain population may be so

central that the agency cannot cut off the provider without violating its

mandate to provide medically necessary services to some or all of its

members.  Additional reasons may also exist.

    The competing evidence will ultimately be weighed by the finder of

fact.  This, of course, is consistent with the Supreme Court's (and this

Court's) acknowledgment that ordinarily the question of whether a

misrepresentation is material is decided by the jury.  *See United States v.*

*Gaudin*, 515 U.S. 506, 512 (1995) ("the materiality inquiry. . .[is] peculiarly

on[e] for the trier of fact," *quoting TSC Industries, Inc. v. Northway, Inc.,* 426

U.S. 438, 450 (1976); *see also, Grande v. St. Paul Fire & Marine Ins. Co.*, 436

F.3d 277, 283 (1st Cir. 2006) (holding that materiality "is ordinarily left to

61

the trier of fact unless the outcome is so clear that a reasonable jury could

decide it only one way").

Given these requirements, any actual knowledge defense raised by a

defendant will rarely be determinable at the motion to dismiss phase.  Most

FCA complaints are unlikely to contain allegations that would allow the

Court to find, as a matter of law, that the government agency actually had

"actual knowledge" when it paid claims.  Certainly there are no such

allegations concerning MassHealth's knowledge in the Second Amended

Complaint.

Relators' complaint describes administrative complaints the Relators

initiated with the Massachusetts Department of Public Health (DPH) and

various branches of the Department of Public Licensing, Office of

Investigations.  JA 56–58, 63–66 (SAC ¶¶ 137–48, 175 –96).  To take

advantage of the actual knowledge defense discussed in *Escobar II*, UHS

will likely argue that these agencies' notice of UHS's staffing problems

provided MassHealth with actual knowledge of UHS' regulatory

violations, and therefore subsequent MassHealth payments of UHS's

claims establish non-materiality.

UHS conflates notice to the DPH and the various professional Boards of Registration with notice to MassHealth, a wholly separate agency. As a matter of government law, notice given to one branch of the bureaucracy does not constitute notice to all other agencies. "One federal agency 'should not be charged with knowledge of what another is doing simply because both are components of the same federal government.'" *Wyler v. Korean Air Lines Co.*, 928 F.2d 1167, 1171 (D.C. Cir. 1991) *quoting J.A. Jones Const. Co. v. United States*, 390 F.2d 886, 891 (Ct. Cl. 1968). The same principle applies to state governments. *Massachusetts v. Mylan Laboratories,* 608 F. Supp. 2d 127, 149–50 (D. Mass. 2008) (holding that for the purpose of determining in an FCA action whether the decision maker knew of the alleged fraudulent scheme, what the State Office of Pharmacy Services and Group Insurance Commission may have known did not establish the knowledge of the Division of Health Care Finance and Policy, a different department of the Commonwealth).

Certainly it would be inappropriate to impute knowledge where the defense requires "actual knowledge", not constructive knowledge. As noted above, the FCA's materiality test focuses on what the recipient of the

63

misrepresentation would have done.  If the person making the payment decisions never knew of the providers' misconduct, its continued payment of claims has no significance.  Here, the allegations of the SAC, viewed in the light most favorable to the Relators, evidence no payments from MassHealth to UHS made with MassHealth's actual knowledge of the misconduct.[15]  In fact, the SAC specifically alleges that if MassHealth had been informed of the violations, the agency would not have paid.  JA 68, 70, 72, 73, 75, 77, 79, 81, 83, 86, 86, 88, 89, 92 (SAC ¶¶ 209, 223, 237, 251, 263, 275, 292, 305, 318, 331, 343, 354, 363 and 378).

The actual knowledge can only apply when it has been established that the paying agency had actual knowledge that the defendant misrepresented its compliance with regulatory requirements and the agency continued to pay the defendant's claims.  Without definitive proof

---

[15] Nor does the complaint evidence any known violations of the MassHealth regulations at issue.  The agencies that performed investigations and disciplinary proceedings sought to enforce their own regulations against UHS.  See, *e.g.* JA 276–95, (SAC Ex. 15), where the Department of Public Health only investigated violations of 105 Mass. Code Regs. § 140, DPH's regulations concerning the licensing of mental health clinics.  No state agencies determined that UHS had violated any of the provisions of 130 Mass Code Regs. § 429.000 *et. seq.*

of actual knowledge at the pleading stage, the complaint cannot be

dismissed.

**IV.   IN THE EVENT THE MATERIALITY TEST OUTLINED BY THE SUPREME COURT FOR FCA CASES IS SUBSTANTIVELY DIFFERENT THAN THE MATERIALITY ANALYSIS PREVIOUSLY APPLIED IN THIS CIRCUIT, THE RELATORS SHOULD BE GIVEN AN OPPORTUNITY TO AMEND THEIR COMPLAINT**

This Court has frequently examined whether allegedly false

statements were material in its review of various fraud based claims,

including claims under the FCA.  As argued herein, Relators do not believe

that the FCA materiality standard identified in *Escobar II* materially alters

the analysis required to be performed under federal fraud statutes or

requires this Court to significantly change the materiality inquiry the Court

has already performed on the allegations of the Relators' complaint.  This

Court, of course, would have the best sense of what, if anything, must be

done differently this time.

If, however, the Court concludes that the nature or the detail of the

review of the Relators' materiality allegations is significantly different

because of the Supreme Court's opinion, it should grant the Relators leave

to amend their complaint to meet the new standard.  Relators' Second

Amended Complaint was drafted in light of this Court's prior precedents,

particularly its FCA precedents.  Abiding by those precedents, this Court

found that the Relators' met the existing standards.  If the rules have

changed, however, Relators should be given the opportunity to show they

can meet the new requirements.  *See e.g. United States ex rel. Dresser v.*

*Qualium Corp.* 2016 WL 3880763, *12 (N.D. Cal. July 18, 2016) (holding that

because United States did not have the benefit of *Escobar II* when it drafted

its Amended Complaint, it was appropriate to allow the United States

leave to amend to provide more detailed materiality allegations).

To the extent it is necessary, there are several factual allegations that

Relators can add to their complaint that would be relevant to the

materiality of UHS's misrepresentations.  These include:

- Adding more detailed allegations regarding the regulatory structure

  including the specific qualifications and supervision requirements set

  forth in §§ 429.441, 429.221 and other relevant regulations.

- Adding detailed allegations regarding the requirements for service codes 90806, 90847 and 90853, and their requirements for compliance with 130 Mass. Code Regs. § 429.424.

- Adding allegations that UHS expressly misrepresented its compliance with applicable Mass Health regulations when it submitted claims under service codes 90806, 90847 and 90853 for numerous employees who did not meet the requirements of 130 Mass. Code Regs. § 429.424.

- Adding allegations regarding the importance of adequately supervised and properly qualified mental health staff to MassHealth and actions taken by MassHealth when it learns of non-compliance with these requirements.

- Adding allegations to establish that MassHealth did not have actual notice of non-compliance with the relevant regulations when it paid UHS's claims.

- Adding allegations that federal and state agencies have pursued UHS for not meeting regulatory requirements to adequately supervise its staff at mental health care facilities, including a qui tam claim that

67

was brought in Virginia in 2007 and state proceedings in California in 2009. These proceedings show that UHS was aware that its compliance with licensing, qualifications and supervision regulations were material to regulatory authorities.

Such allegations should cure any deficiency in the Relators' pleadings in the event that the allegations in the Second Amended Complaint do not sufficiently establish the materiality of the false representations to MassHealth. Due to the fact that no discovery has been taken in this matter and there has been no bad faith or undue delay on the part of the Relators in not previously including such allegations, permitting leave to amend would be in the interests of justice and would not unduly prejudice UHS.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth herein, this Court should find that the Relators' Second Amended Complaint adequately alleges that UHS knowingly made material misrepresentations to MassHealth in connection with the presentation of its claims for payment, and remand the case to the district court for further proceedings consistent with this Court's opinion.

Alternatively, it should remand the case to the district court with instructions to grant the Relators leave to amend their complaint and to conduct further proceedings in this case consistent with its opinion and the opinion of the Supreme Court of the United States.

Dated: August 15, 2016             Respectfully submitted,

                                /s/ Thomas M. Greene
                                THOMAS M. GREENE (Bar No. 1110304)
                                MICHAEL TABB (Bar No. 56721)
                                ELIZABETH CHO (Bar No. 1175798)
                                GREENE LLP
                                One Liberty Square, Suite 1200
                                Boston, MA 02109
                                (617) 261-0040

                                *Counsel for Plaintiffs-Appellants*
                                *Julio Escobar and Carmen Correa*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Greene, do hereby certify that on the 15th day of

August, 2016, I served a copy of the foregoing Appellants' Supplemental

Brief by serving counsel for Defendant-Appellee Universal Health Services,

Inc.:

> Mark W. Pearlstein
> McDermott Will & Emery
> 28 State Street
> Boston, MA 02109-1775

via the CM/ECF System as required by Fed. R. App. P. 25(d) and Local

Rule 25(a).  I certify that the parties or their counsel of record are registered

as ECF filers and that they will be served by the CM/ECF system.

I further certify that on the 15th day of August, 2016, 10 copies of the

foregoing Appellants' Supplemental Brief were mailed to the clerk

pursuant to this Court's order of July 18, 2016 and Local Rule 31.0(b), and 2

copies were mailed to counsel for Defendant-Appellee at the address

above.


Dated: August 15, 2016                    /s/ Thomas M. Greene

70

# Certificate of Compliance With Rule 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☑ this brief contains __12,740__ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using _____ Book Antiqua _____ in 14 point font _____, *or*

☐ this brief has been prepared in a monospaced typeface using _____ _____ with _____.

(s) _Thomas M. Greene_____

Attorney for _Appellants_____

Dated: _8/15/2016_____

# ADDENDUM

## Table of Contents

*Universal Health Services, Inc. v. United States*, ___ U.S. ___, 136.  S. Ct. 1989 (2016). ............................................................................................A-1


130 Mass. Code Regs. 429.000 *et seq.* (2008)................................................A-15

**136 S.Ct. 1989**
Supreme Court of the United States

UNIVERSAL HEALTH SERVICES, INC., Petitioner

v.

UNITED STATES and Massachusetts, ex
rel. Julio Escobar and Carmen Correa.

No. 15–7.
|
Argued April 19, 2016.
|
Decided June 16, 2016.

**Synopsis**
**Background:** Parents, as relators, brought qui tam suit
against healthcare provider under the False Claims Act
(FCA) after their daughter died of a seizure when she
was being treated at a mental health clinic by various
unlicensed and unsupervised staff in violation of state
Medicaid regulations. The United States District Court
for the District of Massachusetts, Douglas P. Woodlock,
J., 2014 WL 1271757, dismissed, and parents appealed.
The United States Court of Appeals for the First Circuit,
Stahl, Circuit Judge, 780 F.3d 504, affirmed in part,
reversed in part, and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Thomas, held that:

[1] the implied false certification theory can be a basis for
liability under the FCA in some circumstances, abrogating
*U.S. v. Sanford–Brown, Ltd.*, 788 F.3d 696, and

[2] the FCA does not limit liability only to instances
where the defendant fails to disclose the violation of a
contractual, statutory, or regulatory provision that the
government expressly designated a condition of payment,
abrogating *Mikes v. Straus,* 274 F.3d 687.

Vacated and remanded.

West Headnotes (26)

**[1]**     **United States**

**[1]**     👉 False certification

The "implied false certification theory,"
providing that when a defendant submits
a claim it impliedly certifies compliance
with all conditions of payment, can be a
basis for liability under the False Claims
Act (FCA), at least where two conditions
are satisfied: (1) the claim does not
merely request payment, but also makes
specific representations about the goods or
services provided; and (2) the defendant's
failure to disclose noncompliance with
material statutory, regulatory, or contractual
requirements makes those representations
misleading half-truths; abrogating *U.S. v.
Sanford–Brown, Ltd.*, 788 F.3d 696. 31
U.S.C.A. § 3729(a)(1)(A).

9 Cases that cite this headnote

**[2]**     **United States**

    👉 False claim

By punishing defendants who submit "false
or fraudulent claims," the False Claims
Act (FCA) encompasses claims that make
fraudulent misrepresentations, which include
certain misleading omissions. 31 U.S.C.A. §
3729(a)(1)(A).

3 Cases that cite this headnote

**[3]**     **United States**

    👉 False certification

When a defendant makes representations in
submitting a claim but omits its violations
of statutory, regulatory, or contractual
requirements, those omissions can, pursuant
to the implied false certification theory, be
a basis for liability under the False Claims
Act (FCA) if they render the defendant's
representations misleading with respect to the
goods or services provided. 31 U.S.C.A. §
3729(a)(1)(A).

5 Cases that cite this headnote

**[4]**     **Statutes**

☞ Statutory terms with common law meanings

Absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.

1 Cases that cite this headnote

**[5]**   **United States**
☞ Statutory provisions

Although the False Claims Act (FCA) abrogated the common law in certain respects, including that the Act's scienter requirement required no proof of specific intent to defraud, the court would presume, when interpreting common-law terms used in the Act, that Congress retained all other elements of common-law fraud that were consistent with the statutory text, because there were no textual indicia to the contrary. 31 U.S.C.A. § 3729 et seq.

Cases that cite this headnote

**[6]**   **United States**
☞ False claim

Because common-law fraud has long encompassed certain misrepresentations by omission, "false or fraudulent claims" within the meaning of the False Claims Act (FCA) include more than just claims containing express falsehoods. 31 U.S.C.A. § 3729(a)(1)(A).

1 Cases that cite this headnote

**[7]**   **United States**
☞ False claim

"Half-truths," that is, representations that state the truth only so far as it goes, while omitting critical qualifying information, can be actionable misrepresentations under the False Claims Act (FCA). 31 U.S.C.A. § 3729(a)(1)(A).

1 Cases that cite this headnote

**[8]**   **Fraud**

☞ Duty to disclose facts

In tort law, if the defendant does speak, he must disclose enough to prevent his words from being misleading.

Cases that cite this headnote

**[9]**   **Fraud**
☞ Fraudulent Concealment

A statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue. Restatement (Second) of Torts § 529.

Cases that cite this headnote

**[10]**   **United States**
☞ False certification
**United States**
☞ Materiality

The False Claims Act (FCA) does not limit liability only to instances where the defendant fails to disclose the violation of a contractual, statutory, or regulatory provision that the government expressly designated a condition of payment; abrogating *Mikes v. Straus,* 274 F.3d 687. 31 U.S.C.A. § 3729(a)(1)(A).

1 Cases that cite this headnote

**[11]**   **United States**
☞ False certification
**United States**
☞ Materiality

Not every undisclosed violation of an express condition of payment automatically triggers liability under the False Claims Act (FCA). 31 U.S.C.A. § 3729(a)(1)(A).

Cases that cite this headnote

**[12]**   **United States**
☞ Materiality

Whether a provision allegedly violated by the defendant is labeled a condition of payment is relevant to but not dispositive of the

Case: 14-1423   Document: 00117042960   Page: 84   Date Filed: 08/15/2016   Entry ID: 6025551

Universal Health Services, Inc. v. U.S., 136 S.Ct. 1989 (2016)

84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

materiality inquiry into whether defendant has made an actionable false or fraudulent claim under the False Claims Act (FCA). 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

3 Cases that cite this headnote

**[13]    Fraud**
👉 Fraudulent Concealment

A statement that misleadingly omits critical facts is a fraudulent misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information.

Cases that cite this headnote

**[14]    Statutes**
👉 Policy considerations;public policy

Policy arguments cannot supersede the clear statutory text.

Cases that cite this headnote

**[15]    United States**
👉 Materiality

A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the government's payment decision in order to be actionable under the False Claims Act (FCA). 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

5 Cases that cite this headnote

**[16]    United States**
👉 Materiality

Materiality, for purposes of determining whether a misrepresentation is actionable under the False Claims Act (FCA), looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

Cases that cite this headnote

**[17]    Fraud**

👉 Materiality of matter represented or concealed

In tort law, a matter is "material" in only two circumstances: (1) if a reasonable man would attach importance to it in determining his choice of action in the transaction; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not. Restatement (Second) of Torts § 538.

Cases that cite this headnote

**[18]    United States**
👉 Materiality

The False Claims Act's (FCA) materiality standard for an actionable false or fraudulent claim is demanding. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

1 Cases that cite this headnote

**[19]    United States**
👉 False Claims

The False Claims Act (FCA) is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations. 31 U.S.C.A. § 3729 et seq.

1 Cases that cite this headnote

**[20]    United States**
👉 Materiality

A misrepresentation cannot be deemed "material," as required to give rise to liability under the False Claims Act (FCA), merely because the government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; nor is it sufficient for a finding of materiality that the government would have the option to decline to pay if it knew of the defendant's noncompliance. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

Case: 14-1423    Document: 00117042960    Page: 85    Date Filed: 08/15/2016    Entry ID: 6025551
Universal Health Services, Inc. v. United States, 1989 (2016)

84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

3 Cases that cite this headnote

Cases that cite this headnote

**[21] United States**
  👉 Materiality

The materiality required for a misrepresentation to be actionable under the False Claims Act (FCA) cannot be found where noncompliance with a particular statutory, regulatory, or contractual requirement is minor or insubstantial. 31 U.S.C.A. §§ 3729(a)(1)(A), (b)(4).

Cases that cite this headnote

**[22] United States**
  👉 Materiality

Proof of the materiality of a misrepresentation about compliance with a statutory, regulatory, or contractual requirement, as required for the misrepresentation to be actionable under the False Claims Act (FCA), can include, but is not necessarily limited to, evidence that the defendant knows that the government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

2 Cases that cite this headnote

**[23] United States**
  👉 Materiality

It is strong evidence that particular statutory, regulatory, or contractual requirements are not material, and thus violations of the requirements do not give rise to liability under the False Claims Act (FCA), if the government pays a particular claim in full despite its actual knowledge that certain requirements were violated, or if the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

**[24] Federal Civil Procedure**
  👉 Fraud, mistake and condition of mind

**United States**
  👉 Materiality

False Claims Act (FCA) plaintiffs must plead their claims with plausibility and particularity by, for instance, pleading facts to support allegations of materiality. 31 U.S.C.A. § 3729 et seq.; Fed.Rules Civ.Proc.Rules 8, 9(b), 28 U.S.C.A.

Cases that cite this headnote

**[25] United States**
  👉 Materiality

A statutory, regulatory, or contractual violation is not "material," and thus cannot give rise to liability under the False Claims Act (FCA), merely because the defendant knows that the government would be entitled to refuse payment were it aware of the violation. 31 U.S.C.A. § 3729(a)(1)(A), (b)(4).

1 Cases that cite this headnote

**[26] United States**
  👉 Materiality

**United States**
  👉 Double or treble damages

The False Claims Act (FCA) is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations. 31 U.S.C.A. § 3729 et seq.

Cases that cite this headnote

**\*1993** *Syllabus*\*

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See

*Universal Health Services, Inc. v. U.S. ex rel. ... 136 S.Ct. 1989 (2016)*

84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

*United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Yarushka Rivera, a teenage beneficiary of Massachusetts' Medicaid program, received counseling services for several years at Arbour Counseling Services, a satellite mental health facility owned and operated by a subsidiary of petitioner Universal Health Services, Inc. She had an adverse reaction to a medication that a purported doctor at Arbour prescribed after diagnosing her with bipolar disorder. Her condition worsened, and she eventually died of a seizure. Respondents, her mother and stepfather, later discovered that few Arbour employees were actually licensed to provide mental health counseling or authorized to prescribe medications or offer counseling services without supervision.

Respondents filed a *qui tam* suit, alleging that Universal Health had violated the False Claims Act (FCA). That Act imposes significant penalties on anyone who "knowingly presents ... a false or fraudulent claim for payment or approval" to the Federal Government, 31 U.S.C. § 3729(a)(1)(A). Respondents sought to hold Universal Health liable under what is commonly referred to as an "implied false certification theory of liability," which treats a payment request as a claimant's implied certification of compliance with relevant statutes, regulations, or contract requirements that are material conditions of payment and treats a failure to disclose a violation as a misrepresentation that renders the claim "false or fraudulent." Specifically, respondents alleged, Universal Health (acting through Arbour) defrauded the Medicaid program by submitting reimbursement claims that made representations about the specific services provided by specific types of professionals, but that failed to disclose serious violations of Massachusetts Medicaid regulations pertaining to staff qualifications and licensing requirements for these services. Universal Health thus allegedly defrauded the program because Universal Health knowingly misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would have refused to pay these claims had it known of these violations.

The District Court granted Universal Health's motion to dismiss. It held that respondents had failed to state a claim under the "implied false certification" theory of liability because none of the regulations violated by Arbour was a condition of payment. The First Circuit reversed in

relevant part, holding that every submission of a claim implicitly represents compliance with relevant regulations, and that any undisclosed violation of a precondition of payment (whether or not expressly identified as such) renders a claim "false or fraudulent." The First Circuit further held that the regulations themselves provided conclusive evidence that compliance was a material condition of payment because the regulations expressly required facilities to adequately supervise staff as a condition of payment.

*Held* :

1. The implied false certification theory can be a basis for FCA liability when a defendant submitting a claim makes specific representations about the goods or services provided, but fails to disclose noncompliance with material statutory, regulatory, or contractual requirements that **\*1994** make those representations misleading with respect to those goods or services. Pp. 1999 – 2001.

(a) The FCA does not define a "false" or "fraudulent" claim, so the Court turns to the principle that "absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,' " *Sekhar v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794. Under the common-law definition of "fraud," the parties agree, certain misrepresentations by omission can give rise to FCA liability. Respondents and the Government contend that every claim for payment implicitly represents that the claimant is legally entitled to payment, and that failing to disclose violations of material legal requirements renders the claim misleading. Universal Health, on the other hand, argues that submitting a claim involves no representations and that the nondisclosure of legal violations is not actionable absent a special duty of reasonable care to disclose such matters. Today's decision holds that the claims at issue may be actionable because they do more than merely demand payment; they fall squarely within the rule that representations that state the truth only so far as it goes, while omitting critical qualifying information, can be actionable misrepresentations. Pp. 1999 – 2000.

(b) By submitting claims for payment using payment codes corresponding to specific counseling services, Universal Health represented that it had provided specific types of treatment. And Arbour staff allegedly made further

representations by using National Provider Identification numbers corresponding to specific job titles. By conveying this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations. Pp. 2000 – 2001.

2. Contrary to Universal Health's contentions, FCA liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment. Pp. 2000 – 2004.

(a) Section 3729(a)(1)(A), which imposes liability on those presenting "false or fraudulent claim[s]," does not limit claims to misrepresentations about express conditions of payment. Nothing in the text supports such a restriction. And under the Act's materiality requirement, statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment. Nor is the restriction supported by the Act's scienter requirement. A defendant can have "actual knowledge" that a condition is material even if the Government does not expressly call it a condition of payment. What matters is not the label that the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision. Universal Health's policy arguments are unavailing, and are amply addressed through strict enforcement of the FCA's stringent materiality and scienter provisions. Pp. 2001 – 2003.

(b) A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the FCA. The FCA's materiality requirement is demanding. An undisclosed fact is material if, for instance, "[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood" of the undisclosed fact. *Junius Constr. Co. v. Cohen,* 257 N.Y. 393, 400, 178 N.E. 672, 674. When evaluating the FCA's materiality **\*1995** requirement, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular requirement as a condition of payment. Nor is the Government's option to decline to

pay if it knew of the defendant's noncompliance sufficient for a finding of materiality. Materiality also cannot be found where noncompliance is minor or insubstantial. Moreover, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. The FCA thus does not support the Government's and First Circuit's expansive view that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation. Pp. 2002 – 2004.

780 F.3d 504, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Roy T. Englert, Jr., Washington, DC, for Petitioner.

David C. Frederick, Washington, DC, for Respondents.

Malcolm L. Stewart for the United States as amicus curiae, by special leave of the Court, supporting the respondents.

Mark W. Pearlstein, Laura McLane, Evan D. Panich, McDermott Will & Emery LLP, Boston, MA, M. Miller Baker, McDermott Will & Emery LLP, Roy T. Englert, Jr., Gary A. Orseck, Mark T. Stancil, Michael L. Waldman, Donald Burke, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, for Petitioner.

Thomas M. Greene, Michael Tabb, Elizabeth Cho, Greene LLP, Boston, MA, David C. Frederick, Derek T. Ho, Katherine C. Cooper, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Respondents.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

The False Claims Act, 31 U.S.C. § 3729 *et seq.,* imposes significant penalties on those who defraud the Government. This case concerns a theory of False Claims Act liability commonly referred to as "implied false certification." According to this theory, when a defendant

submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A). This case requires us to consider this theory of liability and to clarify some of the circumstances in which the False Claims Act imposes liability.

We first hold that, at least in certain circumstances, the implied false certification theory can be a basis for liability. Specifically, liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading.

 **\*1996** We further hold that False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment. Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment. Conversely, even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability. What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.

A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act. We clarify below how that rigorous materiality requirement should be enforced.

Because the courts below interpreted § 3729(a)(1)(A) differently, we vacate the judgment and remand so that those courts may apply the approach set out in this opinion.

I

A

Enacted in 1863, the False Claims Act "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). "[A] series of sensational congressional investigations" prompted hearings where witnesses "painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). Congress responded by imposing civil and criminal liability for 10 types of fraud on the Government, subjecting violators to double damages, forfeiture, and up to five years' imprisonment. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696.

Since then, Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims. See 31 U.S.C. § 3729(a) (imposing civil liability on "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). A "claim" now includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs. See § 3729(b)(2)(A). The Act's scienter requirement defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). And the Act defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4).

Congress also has increased the Act's civil penalties so that liability is "essentially punitive in nature." *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 784, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Defendants are subjected to treble damages plus civil penalties of up to $10,000 per false claim. § 3729(a); 28 CFR § 85.3(a)(9) (2015) (adjusting penalties for inflation).

Universal Health Services, Inc. v. U.S., 136 S.Ct. 1989 (2016)

84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

## B

The alleged False Claims Act violations here arose within the Medicaid program, a **\*1997** joint state-federal program in which healthcare providers serve poor or disabled patients and submit claims for government reimbursement. See generally 42 U.S.C. § 1396 *et seq.* The facts recited in the complaint, which we take as true at this stage, are as follows. For five years, Yarushka Rivera, a teenage beneficiary of Massachusetts' Medicaid program, received counseling services at Arbour Counseling Services, a satellite mental health facility in Lawrence, Massachusetts, owned and operated by a subsidiary of petitioner Universal Health Services. Beginning in 2004, when Yarushka started having behavioral problems, five medical professionals at Arbour intermittently treated her. In May 2009, Yarushka had an adverse reaction to a medication that a purported doctor at Arbour prescribed after diagnosing her with bipolar disorder. Her condition worsened; she suffered a seizure that required hospitalization. In October 2009, she suffered another seizure and died. She was 17 years old.

Thereafter, an Arbour counselor revealed to respondents Carmen Correa and Julio Escobar—Yarushka's mother and stepfather—that few Arbour employees were actually licensed to provide mental health counseling and that supervision of them was minimal. Respondents discovered that, of the five professionals who had treated Yarushka, only one was properly licensed. The practitioner who diagnosed Yarushka as bipolar identified herself as a psychologist with a Ph. D., but failed to mention that her degree came from an unaccredited Internet college and that Massachusetts had rejected her application to be licensed as a psychologist. Likewise, the practitioner who prescribed medicine to Yarushka, and who was held out as a psychiatrist, was in fact a nurse who lacked authority to prescribe medications absent supervision. Rather than ensuring supervision of unlicensed staff, the clinic's director helped to misrepresent the staff's qualifications. And the problem went beyond those who treated Yarushka. Some 23 Arbour employees lacked licenses to provide mental health services, yet—despite regulatory requirements to the contrary—they counseled patients and prescribed drugs without supervision.

When submitting reimbursement claims, Arbour used payment codes corresponding to different services that its staff provided to Yarushka, such as "Individual Therapy" and "family therapy." 1 App. 19, 20. Staff members also misrepresented their qualifications and licensing status to the Federal Government to obtain individual National Provider Identification numbers, which are submitted in connection with Medicaid reimbursement claims and correspond to specific job titles. For instance, one Arbour staff member who treated Yarushka registered for a number associated with " 'Social Worker, Clinical,' " despite lacking the credentials and licensing required for social workers engaged in mental health counseling. 1 *id.,* at 32.

After researching Arbour's operations, respondents filed complaints with various Massachusetts agencies. Massachusetts investigated and ultimately issued a report detailing Arbour's violation of over a dozen Massachusetts Medicaid regulations governing the qualifications and supervision required for staff at mental health facilities. Arbour agreed to a remedial plan, and two Arbour employees also entered into consent agreements with Massachusetts.

In 2011, respondents filed a *qui tam* suit in federal court, see 31 U.S.C. § 3730, alleging that Universal Health had violated the False Claims Act under an implied false certification theory of liability. The operative complaint asserts that Universal Health (acting through Arbour) submitted **\*1998** reimbursement claims that made representations about the specific services provided by specific types of professionals, but that failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services.[1] Specifically, the Massachusetts Medicaid program requires satellite facilities to have specific types of clinicians on staff, delineates licensing requirements for particular positions (like psychiatrists, social workers, and nurses), and details supervision requirements for other staff. See 130 Code Mass. Regs. §§ 429.422–424, 429.439 (2014). Universal Health allegedly flouted these regulations because Arbour employed unqualified, unlicensed, and unsupervised staff. The Massachusetts Medicaid program, unaware of these deficiencies, paid the claims. Universal Health thus allegedly defrauded the program, which would not have reimbursed the claims had it known that it was billed for mental health services that were performed by unlicensed and unsupervised staff. The United States declined to intervene.

Case: 14-1423 Document: 00117042960 Page: 90 Date Filed: 08/15/2016 Entry ID: 6025551

Universal Health Services, Inc. v. United States, 136 S.Ct. 1989 (2016)
84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

1  Although Universal Health submitted some of the claims at issue before 2009, we assume—as the parties have done—that the 2009 amendments to the False Claims Act apply here. Universal Health does not argue, and we thus do not consider, whether pre–2009 conduct should be treated differently.

The District Court granted Universal Health's motion to dismiss the complaint. Circuit precedent had previously embraced the implied false certification theory of liability. See, e.g., United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377, 385–387 (C.A.1 2011). But the District Court held that respondents had failed to state a claim under that theory because, with one exception not relevant here, none of the regulations that Arbour violated was a condition of payment. See 2014 WL 1271757, *1, *6–*12 (D.Mass., Mar. 26, 2014).

The United States Court of Appeals for the First Circuit reversed in relevant part and remanded. 780 F.3d 504, 517 (2015). The court observed that each time a billing party submits a claim, it "implicitly communicate[s] that it conformed to the relevant program requirements, such that it was entitled to payment." Id., at 514, n. 14. To determine whether a claim is "false or fraudulent" based on such implicit communications, the court explained, it "asks simply whether the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment." Id., at 512. In the court's view, a statutory, regulatory, or contractual requirement can be a condition of payment either by expressly identifying itself as such or by implication. Id., at 512–513. The court then held that Universal Health had violated Massachusetts Medicaid regulations that "clearly impose conditions of payment." Id., at 513. The court further held that the regulations themselves "constitute[d] dispositive evidence of materiality," because they identified adequate supervision as an "express and absolute" condition of payment and "repeated[ly] reference[d]" supervision. Id., at 514 (internal quotation marks omitted).

We granted certiorari to resolve the disagreement among the Courts of Appeals over the validity and scope of the implied false certification theory of liability. 577 U.S. ——, 136 S.Ct. 582, 193 L.Ed.2d 465 (2015). The Seventh Circuit has rejected this theory, reasoning that only express (or affirmative) falsehoods can render a claim "false or fraudulent" under 31 U.S.C. § 3729(a)(1)(A). *1999 United States v. Sanford–Brown, Ltd.,

788 F.3d 696, 711–712 (2015). Other courts have accepted the theory, but limit its application to cases where defendants fail to disclose violations of expressly designated conditions of payment. E.g., Mikes v. Straus, 274 F.3d 687, 700 (C.A.2 2001). Yet others hold that conditions of payment need not be expressly designated as such to be a basis for False Claims Act liability. E.g., United States v. Science Applications Int'l Corp., 626 F.3d 1257, 1269 (C.A.D.C.2010) (SAIC ).

II

[1] [2] [3] We first hold that the implied false certification theory can, at least in some circumstances, provide a basis for liability. By punishing defendants who submit "false or fraudulent claims," the False Claims Act encompasses claims that make fraudulent misrepresentations, which include certain misleading omissions. When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.

[4] [5] To reach this conclusion, "[w]e start, as always, with the language of the statute." Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 668, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (brackets in original; internal quotation marks omitted). The False Claims Act imposes civil liability on "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." § 3729(a)(1)(A). Congress did not define what makes a claim "false" or "fraudulent." But "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." Sekhar v. United States, 570 U.S. ——, ——, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013) (internal quotation marks omitted). And the term "fraudulent" is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud. See Neder v. United States, 527 U.S. 1, 22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (the term "actionable 'fraud' " is one with "a well-settled meaning at common law"). [2]

2  The False Claims Act abrogates the common law in certain respects. For instance, the Act's scienter

requirement "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). But we presume that Congress retained all other elements of common-law fraud that are consistent with the statutory text because there are no textual indicia to the contrary. See *Neder,* 527 U.S., at 24–25, 119 S.Ct. 1827.

**[6]**    Because common-law fraud has long encompassed certain misrepresentations by omission, "false or fraudulent claims" include more than just claims containing express falsehoods. The parties and the Government agree that misrepresentations by omission can give rise to liability. Brief for Petitioner 30–31; Brief for Respondents 22–31; Brief for United States as *Amicus Curiae* 16–20.

The parties instead dispute whether submitting a claim without disclosing violations of statutory, regulatory, or contractual requirements constitutes such an actionable misrepresentation. Respondents and the Government invoke the common-law rule that, while nondisclosure alone ordinarily is not actionable, "[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter" is actionable. Restatement (Second) of Torts § 529, p. 62 (1976). They contend that every submission of a claim for payment **\*2000** implicitly represents that the claimant is legally entitled to payment, and that failing to disclose violations of material legal requirements renders the claim misleading. Universal Health, on the other hand, argues that submitting a claim involves no representations, and that a different common-law rule thus governs: nondisclosure of legal violations is not actionable absent a special " 'duty ... to exercise reasonable care to disclose the matter in question,' " which it says is lacking in Government contracting. Brief for Petitioner 31 (quoting Restatement (Second) of Torts § 551(1), at 119).

**[7]**    **[8]**    We need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment. The claims in this case do more than merely demand payment. They fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.[3] A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road

might bisect the property. See *Junius Constr. Co. v. Cohen,* 257 N.Y. 393, 400, 178 N.E. 672, 674 (1931) (Cardozo, J.). "The enumeration of two streets, described as unopened but projected, was a tacit representation that the land to be conveyed was subject to no others, and certainly subject to no others materially affecting the value of the purchase." *Ibid.* Likewise, an applicant for an adjunct position at a local college makes an actionable misrepresentation when his resume lists prior jobs and then retirement, but fails to disclose that his "retirement" was a prison stint for perpetrating a $12 million bank fraud. See 3 D. Dobbs, P. Hayden, & H. Bublick, Law of Torts § 682, pp. 702–703, and n. 14 (2d ed. 2011) (citing *Sarvis v. Vermont State Colleges,* 172 Vt. 76, 78, 80–82, 772 A.2d 494, 496, 497–499 (2001)).

3    This rule recurs throughout the common law. In tort law, for example, "if the defendant does speak, he must disclose enough to prevent his words from being misleading." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 106, p. 738 (5th ed. 1984). Contract law also embraces this principle. See, *e.g.,* Restatement (Second) of Contracts § 161, Comment *a,* p. 432 (1979). And we have used this definition in other statutory contexts. See, *e.g., Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (securities law).

So too here, by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, Arbour staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context. Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. § 429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, § 429.424(C). By using payment and other codes that conveyed this information without

Case: 14-1423     Document: 00117042960     Page: 92     Date Filed: 08/15/2016     Entry ID: 6025551

Universal Health Services, Inc., 136 S.Ct. 1989 (2016)
84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

disclosing Arbour's many violations of basic staff and licensing requirements for mental **\*2001** health facilities, Universal Health's claims constituted misrepresentations.

**[9]** Accordingly, we hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.[4]

[4] As an alternative argument, Universal Health asserts that misleading partial disclosures constitute fraudulent misrepresentations only when the initial statement partially disclosed unfavorable information. Not so. "[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." Restatement (Second) of Torts, § 529, Comment *a*, pp. 62–63 (1976).

## III

**[10]** **[11]** **[12]** The second question presented is whether, as Universal Health urges, a defendant should face False Claims Act liability only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment. We conclude that the Act does not impose this limit on liability. But we also conclude that not every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry.

## A

**[13]** Nothing in the text of the False Claims Act supports Universal Health's proposed restriction. Section 3729(a)(1)(A) imposes liability on those who present "false or fraudulent claims" but does not limit such claims to misrepresentations about express conditions of payment. See *SAIC,* 626 F.3d, at 1268 (rejecting any textual basis for an express-designation rule). Nor does the common-law

meaning of fraud tether liability to violating an express condition of payment. A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information. *Supra,* at 1999 – 2001.

The False Claims Act's materiality requirement also does not support Universal Health. Under the Act, the misrepresentation must be material to the other party's course of action. But, as discussed below, see *infra,* at 2003 – 2004, statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment. Cf. *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (materiality cannot rest on "a single fact or occurrence as always determinative" (internal quotation marks omitted)).

Nor does the Act's scienter requirement, § 3729(b)(1)(A), support Universal Health's position. A defendant can have "actual knowledge" that a condition is material without the Government expressly calling it a condition of payment. If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition **\*2002** would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

**[14]** Universal Health nonetheless contends that False Claims Act liability should be limited to undisclosed violations of expressly designated conditions of payment to provide defendants with fair notice and to cabin liability. But policy arguments cannot supersede the clear statutory text. *Kloeckner v. Solis,* 568 U.S. ——, —— – ——, n. 4, 133 S.Ct. 596, 607, n. 4, 184 L.Ed.2d 433 (2012). In any event, Universal Health's approach risks undercutting these policy goals. The Government might respond by designating every legal requirement an express condition of payment. But billing parties are often subject to thousands of complex statutory and regulatory provisions. Facing False Claims Act liability for violating any of them would hardly help would-be defendants anticipate and prioritize compliance

obligations. And forcing the Government to expressly designate a provision as a condition of *payment* would create further arbitrariness. Under Universal Health's view, misrepresenting compliance with a requirement that the Government expressly identified as a condition of payment could expose a defendant to liability. Yet, under this theory, misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim would not.

Moreover, other parts of the False Claims Act allay Universal Health's concerns. "[I]nstead of adopting a circumscribed view of what it means for a claim to be false or fraudulent," concerns about fair notice and open-ended liability "can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." *SAIC, supra,* at 1270. Those requirements are rigorous.

### B

[15] As noted, a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act. We now clarify how that materiality requirement should be enforced.

Section 3729(b)(4) defines materiality using language that we have employed to define materiality in other federal fraud statutes: "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." See *Neder,* 527 U.S., at 16, 119 S.Ct. 1827 (using this definition to interpret the mail, bank, and wire fraud statutes); *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (same for fraudulent statements to immigration officials). This materiality requirement descends from "common-law antecedents." *Id.,* at 769, 108 S.Ct. 1537. Indeed, "the common law could not have conceived of 'fraud' without proof of materiality." *Neder, supra,* at 22, 119 S.Ct. 1827; see also Brief for United States as *Amicus Curiae* 30 (describing common-law principles and arguing that materiality under the False Claims Act should involve a "similar approach").

[16] [17] We need not decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)

(4) or derived directly from the common law. Under any understanding of the concept, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston). In tort law, for instance, a "matter is material" in only two circumstances: (1) "[if] a reasonable man would **\*2003** attach importance to [it] in determining his choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in determining his choice of action," even though a reasonable person would not. Restatement (Second) of Torts § 538, at 80. Materiality in contract law is substantially similar. See Restatement (Second) of Contracts § 162(2), and Comment *c,* pp. 439, 441 (1979) ("[A] misrepresentation is material" only if it would "likely ... induce a reasonable person to manifest his assent," or the defendant "knows that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent" to the transaction). [5]

[5]    Accord, Williston § 69:12, pp. 549–550 ("most popular" understanding is "that a misrepresentation is material if it concerns a matter to which a reasonable person would attach importance in determining his or her choice of action with respect to the transaction involved: which will induce action by a complaining party[,] knowledge of which would have induced the recipient to act differently" (footnote omitted)); *id.,* at 550 (noting rule that "a misrepresentation is material if, had it not been made, the party complaining of fraud would not have taken the action alleged to have been induced by the misrepresentation"); *Junius Constr. Co. v. Cohen,* 257 N.Y. 393, 400, 178 N.E. 672, 674 (1931) (a misrepresentation is material if it "went to the very essence of the bargain"); cf. *Neder v. United States,* 527 U.S. 1, 16, 22, n. 5, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (relying on " 'natural tendency to influence' " standard and citing Restatement (Second) of Torts § 538 definition of materiality).

[18] [19] [20] [21] The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," *Allison Engine,* 553 U.S., at 672, 128 S.Ct. 2123 or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or

contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial. See *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 543, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (contractors' misrepresentation that they satisfied a non-collusive bidding requirement for federal program contracts violated the False Claims Act because "[t]he government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive"); see also *Junius Constr.,* 257 N.Y., at 400, 178 N.E., at 674 (an undisclosed fact was material because "[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood" of the undisclosed fact).

**[22] [23] [24]** In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual **\*2004** knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material. [6]

[6] We reject Universal Health's assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment. The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.

**[25]** These rules lead us to disagree with the Government's and First Circuit's view of materiality:

that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation. See Brief for United States as *Amicus Curiae* 30; Tr. of Oral Arg. 43 (Government's "test" for materiality "is whether the person knew that the government could lawfully withhold payment"); 780 F.3d, at 514; see also Tr. of Oral Arg. 26, 29 (statements by respondents' counsel endorsing this view). At oral argument, the United States explained the implications of its position: If the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act. To the Government, liability would attach if the defendant's use of foreign staplers would entitle the Government not to pay the claim in whole or part—irrespective of whether the Government routinely pays claims despite knowing that foreign staplers were used. *Id.,* at 39–45. Likewise, if the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability.

* * *

**[26]** Because both opinions below assessed respondents' complaint based on interpretations of § 3729(a)(1)(A) that differ from ours, we vacate the First Circuit's judgment and remand the case for reconsideration of whether respondents have sufficiently pleaded a False Claims Act violation. See *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund,* 575 U.S. ——, ——, 135 S.Ct. 1318, 1332–1333, 191 L.Ed.2d 253 (2015). We emphasize, however, that the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations. This case centers on allegations of fraud, not medical malpractice. Respondents have alleged that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations. Respondents may well have adequately pleaded a violation of § 3729(a)(1)(A). But we leave it to the courts below to resolve this in the first instance.

Universal Health Services, Inc. v. U.S., 136 S.Ct. 1989 (2016)
84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647...

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

136 S.Ct. 1989, 84 USLW 4410, 41 IER Cases 709, Med & Med GD (CCH) P 305,647, 14 Cal. Daily Op. Serv. 6223, 2016 Daily Journal D.A.R. 5828, 26 Fla. L. Weekly Fed. S 258

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  14

A-14

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title Table of Contents | Page iv |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

4.  PROGRAM REGULATIONS

429.401:  Introduction ................................................................................................  4-1
429.402:  Definitions ...................................................................................................  4-1
429.403:  Eligible Members  .......................................................................................  4-4
429.404:  Provider Eligibility .....................................................................................  4-4
429.405:  In-State Providers:  Certification ...............................................................  4-5
429.406:  In-State Providers:  Reporting Requirements .............................................  4-5
429.407:  In-State Providers:  Revocation of Certification ........................................  4-6
429.408:  In-State Providers:  Maximum Allowable Fees ..........................................  4-6
429.409:  Out-of-State Providers:  Maximum Allowable Fees ...................................  4-7
429.410:  Nonreimbursable Services ..........................................................................  4-7
429.411:  Referrals ......................................................................................................  4-8
429.412:   Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Services ...........  4-8
(130 CMR 429.413 through 429.420 Reserved)
429.421:  Scope of Services  .......................................................................................  4-9
429.422:  Staff Composition Requirements  ...............................................................  4-10
429.423:  Position Specifications and Qualifications .................................................  4-10
429.424:  Qualifications of Staff by Core Discipline .................................................  4-12
(130 CMR 429.425 through 429.430 Reserved)
429.431:  Operating Procedures ..................................................................................  4-15
429.432:  Treatment Planning and Case Review..........................................................  4-15
429.433:  Coordination of Medical Care .....................................................................  4-16
429.434:  Schedule of Operations ...............................................................................  4-16
429.435:  Utilization Review Plan ...............................................................................  4-16
429.436:  Recordkeeping Requirements ......................................................................  4-17
429.437:  Written Policies and Procedures ..................................................................  4-19
429.438:  Administration ..............................................................................................  4-19
429.439:  Satellite Programs ........................................................................................  4-20
429.440:  Outreach Programs .......................................................................................  4-21
429.441:  Service Limitations ......................................................................................  4-22
429.442:  Child and Adolescent Needs and Strengths (CANS) Data Reporting.......................  4-25

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-1 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.401:  Introduction

      130 CMR 429.000 establishes requirements for participation of mental health centers in MassHealth and governs mental health centers operated by freestanding clinics, satellite facilities of clinics, and identifiable units of clinics. All mental health centers participating in MassHealth must comply with the MassHealth regulations, including but not limited to MassHealth regulations set forth in 130 CMR 429.000 and 450.000.

429.402:  Definitions

      The following terms used in 130 CMR 429.000 have the meanings given in 130 CMR 429.402 unless the context clearly requires a different meaning.

After-Hours Telephone Service — telephone coverage during the hours when the center is closed for members who are in a crisis state.

Autonomous Satellite Program — a mental health center program operated by a satellite facility with sufficient staff and services to substantially assume its own clinical management independent of the parent center.

Case Consultation — a scheduled meeting of at least one-half hour's duration between the clinical staff at the mental health center and other providers of treatment concerning a member who is a center's client. Other providers of treatment are professional staff who are not employed by the mental health center but who are actively providing care or treatment for the member. The purpose of case consultation must be at least one of the following:
    (1)  to identify and plan for additional services;
    (2)  to coordinate a treatment plan with other providers involved in the member's care;
    (3)  to review the member's progress; or
    (4)  to revise the treatment plan as required.

Child and Adolescent Needs and Strengths (CANS) — a tool that provides a standardized way to organize information gathered during behavioral-health clinical assessments. A Massachusetts version of the tool has been developed and is intended to be used as a treatment decision support tool for behavioral-health providers serving MassHealth members under the age of 21.

Core Discipline — one of the following disciplines: psychiatry, social work, psychology, or psychiatric nursing, most or all of which are represented by the professionals qualified in these disciplines who comprise a mental health center's core team.

Core Team — a group of three or more mental-health professionals that must include a psychiatrist and one each of at least two of the following professionals: clinical or counseling psychologist, psychiatric social worker, or psychiatric nurse. The members of this group collaborate in developing a diagnostic evaluation and treatment plan for the patient, utilizing their particular skills, competencies, and perspectives.

Couple Therapy — psychotherapeutic services provided to a couple whose primary complaint is the disruption of their marriage, family, or relationship.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-2 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

Crisis Intervention/Emergency Services — immediate mental health evaluation, diagnosis, hospital prescreening, treatment, and arrangements for further care and assistance as required, provided during all hours to clients showing sudden, incapacitating emotional stress.

Dependent Satellite Program — a mental health center program in a satellite facility that is under the direct clinical management of the parent center.

Diagnostic Services — the examination and determination of a patient's physical, psychological, social, economic, educational, and vocational assets and disabilities for the purpose of designing a treatment plan.

Family Consultation — a scheduled meeting of at least one-half hour with one or more of the parents, legal guardian, or foster parents of a child who is being treated by clinical staff at the center, when the parents, legal guardian, or foster parents are not clients of the center.

Family Therapy — the psychotherapeutic treatment of more than one member of a family simultaneously in the same session.

Freestanding Clinic — any institution licensed as a clinic by the Massachusetts Department of Public Health pursuant to M.G.L. c. 111, s. 51, that is not part of a hospital and that possesses its own legal identity, maintains its own patient records, and administers its own budget and personnel. Such institutions include mental health centers and community health centers.

Group Therapy — the application of psychotherapeutic or counseling techniques to a group of persons, most of whom are not related by blood, marriage, or legal guardianship.

Home Visits — crisis intervention, individual, group, or family therapy, and medication provided in the residence (excluding a medical institution) of a current member, when the member is unable to be served on the center's premises.

Identifiable Unit — a separate organizational unit that is located in a separate part of a clinic, and that is identifiable in its fiscal, personnel, and program elements.

Individual Therapy — psychotherapeutic services provided to an individual.

Long-Term Therapy — a combination of diagnostics and individual, couple, family, and group therapy planned to extend more than 12 sessions.

Medication Visit — a member visit specifically for the prescription, review, and monitoring of psychotropic medication by a psychiatrist or administration of prescribed intramuscular medication by a physician or a nurse.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-5 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.405:  In-State Providers:  Certification

(A)  A center operated by a freestanding clinic, or an identifiable unit of a clinic, must meet the requirements listed in 130 CMR 429.421 through 429.441 in order to be certified by the MassHealth agency. A center operated by a satellite facility of a freestanding clinic must meet all the requirements for certification as well as the additional requirements outlined in 130 CMR 429.439, except for a dependent satellite program that is exempt from full compliance with 130 CMR 429.421, subject to the conditions set forth in 130 CMR 429.439(D).

(B)  A separate application for certification as a mental health center must be submitted for each parent center and satellite facility operated by the applicant. The application must be made on the form provided by the MassHealth agency and must be submitted to the MassHealth agency's Mental Health Center Program. The MassHealth agency may request additional information from the applicant to evaluate the center's compliance with the regulations in 130 CMR 429.000.

(C)  Based on the information revealed in the certification application and the findings of a site inspection, the MassHealth agency will determine whether the applicant is certifiable or not. The MassHealth agency will notify the applicant of the determination in writing within 60 days after the date of the site visit. If the MassHealth agency determines that the applicant is not certifiable, the notice will contain a statement of the reasons for that determination, recommendations for corrective action, and an assessment of the applicant's prospects for certification, so that the applicant may reapply for certification once corrective action has been taken.

(D)  The certification is valid only for the center described in the application and is not transferable to other centers operated at other locations by the applicant. Any additional center established by the applicant at a satellite facility must obtain separate certification from the MassHealth agency in order to receive payment.

429.406:  In-State Providers:  Reporting Requirements

(A)  All mental health centers must complete an annual report on forms furnished by the MassHealth agency and file them with the MassHealth agency within 90 days after the close of the MassHealth agency's fiscal year. The report must include the current staffing pattern, indicate any revisions or changes in written policies and procedures, describe the role of the psychiatrist, and provide any other information that the MassHealth agency may request.

(B)  The MassHealth agency may conduct a site visit to verify compliance with 130 CMR 429.000. If deficiencies are observed during such a site visit, the MassHealth agency will send the center a letter itemizing these deficiencies. The center must then submit a plan of correction for all deficiencies cited in the letter, including the specific corrective steps to be taken, a timetable for these steps, and the date by which full compliance will be achieved, which must be no later than three months after the date of the MassHealth agency's letter. The MassHealth agency will accept the plan of correction only if it conforms to these requirements.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-6 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(C) All centers must submit promptly to the MassHealth agency the name and resume of any new clinical director or administrator. (See 130 CMR 429.423.)

(D) All centers must comply with all reporting requirements established under regulations of the Massachusetts Division of Health Care Finance and Policy.

## 429.407: In-State Providers: Revocation of Certification

(A) The MassHealth agency has the right to review a mental health center's continued compliance with the conditions for certification referred to in 130 CMR 429.405 and the reporting requirements in 130 CMR 429.406 upon reasonable notice and at any reasonable time during the center's hours of operation. The MassHealth agency has the right to revoke the certification, subject to any applicable provisions of the MassHealth administrative and billing regulations at 130 CMR 450.000, if such review reveals that the center has failed to or ceased to meet such conditions.

(B) If the MassHealth agency determines that there exists good cause for the imposition of a lesser sanction than revocation of certification, it may withhold payment, temporarily suspend the center from participation in MassHealth, or impose some other lesser sanction as the MassHealth agency sees fit.

## 429.408: In-State Providers: Maximum Allowable Fees

(A) The MassHealth agency pays for mental health center services with rates set by the Massachusetts Division of Health Care Finance and Policy (DHCFP), subject to the conditions, exclusions, and limitations set forth in 130 CMR 429.000. DHCFP fees for mental health center services are contained in 114.3 CMR 6.00.

(B) In the event that the center has a sliding-scale charge structure, the maximum published charges will be considered the center's usual charge to the general public, provided the following conditions are met:
  (1) the center's full charges must be published in a fee schedule;
  (2) the center's revenues must be based on the application of full charges with allowances noted for reduction of fees;
  (3) the center's procedure for reduction of fees must be in accordance with written policies; and
  (4) the center must maintain sufficient information to document the amount of the reductions.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-7 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(C) <u>Administrative Operations</u>.  Payment by the MassHealth agency for a mental-health service includes payment for administrative operations and for all aspects of service delivery not explicitly included in 130 CMR 429.000, such as, but not limited to
    (1)  patient registration;
    (2)  telephone contacts with members or other parties;
    (3)  supervision or consultation with another staff member;
    (4)  information and referral; and
    (5)  recordkeeping.

### 429.409:  Out-of-State Providers:  Maximum Allowable Fees

Payment to a mental health center located out of state is in accordance with the applicable rate schedule of its state's medical assistance program or its equivalent and is always subject to the applicable conditions, exclusions, and limitations set forth in 130 CMR 429.000.

### 429.410:  Nonreimbursable Services

(A) <u>Nonmedical Services</u>.  The MassHealth agency does not pay mental health centers for nonmedical services. These services include, but are not limited to, the following:
    (1)  vocational rehabilitation services;
    (2)  sheltered workshops (a program of vocational counseling and training in which participants receive paid work experience or other supervised employment);
    (3)  educational services;
    (4)  recreational services (play therapy, the use of play activities with a child in an identified treatment setting as an alternative to strictly verbal expression of conflicts and feelings, is not considered a recreational service and is reimbursable);
    (5)  street worker services (information, referral, and advocacy to certain age populations; liaison with other agencies; role modeling; and community organization); and
    (6)  life-enrichment services (ego-enhancing services such as workshops or educational courses provided to functioning persons).

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-8 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(B)  <u>Nonmedical Programs</u>.  The MassHealth agency does not pay for diagnostic and treatment services that are provided as an integral part of a planned and comprehensive program that is organized to provide primarily nonmedical or other nonreimbursable services. Such programs include residential programs, day activity programs, drop-in centers, and educational programs.

(C)  <u>Research and Experimental Treatment</u>.  The MassHealth agency does not pay for research or experimental treatment.

(D)  <u>Referrals</u>.  A provider to whom a member is referred must bill the MassHealth agency directly, not through the mental health center. (See 130 CMR 429.411.)

429.411:  <u>Referrals</u>

(A)  All services provided by referral must be based on written agreements between the mental health center and the provider to whom a member is referred that ensure continuity of care, exchange of relevant health information, such as test results and records, and avoidance of service duplication. This agreement must also contain follow-up provisions to ensure that the referral process is completed successfully.

(B)  The provider to whom a member is referred must bill the MassHealth agency directly for all such referral services, not through the mental health center. In order to receive payment for referral services, the referral provider must be a participating provider in MassHealth on the date of service.

429.412:  <u>Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Services</u>

The MassHealth agency pays for all medically necessary mental health center services for EPSDT-eligible members in accordance with 130 CMR 450.140 et seq., without regard to service limitations described in 130 CMR 429.000, and with prior authorization.

(130 CMR 429.413 through 429.420 Reserved)

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-9 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.421:  Scope of Services

    (A)  Requirements.
        (1)  A mental health center must have services available to treat a wide range of mental and emotional disorders, and it must provide comprehensive diagnostic assessments for a wide range of problems. In certain rare circumstances, the MassHealth agency may waive the requirement that the center directly provide one or more of these services if the center has a written referral agreement with another source of care to provide such services, and makes such referrals according to the provisions of 130 CMR 429.411.
        (2)  All services must be clinically determined to be medically necessary and appropriate, and must be delivered by qualified staff in accordance with 130 CMR 429.424, and as part of the treatment plan in accordance with 130 CMR 429.432. These services are provided in intermittent sessions that ordinarily last less than two hours and are available on a walk-in or an appointment basis. Except for diagnostic and crisis intervention/emergency services, mental health centers must deliver all services to members with a psychiatric diagnosis and who function at a sufficient level to benefit from treatment.

    (B)  Diagnostic and Treatment Services.  A center must have the capacity to provide at least the following diagnostic and treatment services, as defined in 130 CMR 429.402:
        (1)  diagnostic services;
        (2)  psychological testing;
        (3)  long-term therapy;
        (4)  short-term therapy;
        (5)  individual therapy;
        (6)  couple therapy;
        (7)  family therapy;
        (8)  group therapy;
        (9)  medication visit;
        (10)  case consultation;
        (11)  family consultation;
        (12)  crisis intervention/emergency services;
        (13)  after-hours telephone service. The telephone service must provide arrangements for effectively responding to the crisis. (A tape-recorded telephone message instructing patients to call a hospital emergency room is not acceptable.)  Acceptable arrangements include
            (a)  professional staff members available to talk to clients over the telephone and, if indicated, to arrange for further care and assistance directly or through referral; or
            (b)  an after-hours live telephone service and a referral arrangement with a local hospital emergency department or other emergency service, established through a written agreement that sets forth the policy, personnel, referral, coordination, and other procedural commitments as set forth in 130 CMR 429.411; and
        (14)  home visits.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-10 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.422:  Staff Composition Requirements

(A)  The mental health center must have a balanced interdisciplinary staffing plan that includes three or more core professional staff members who meet the qualifications outlined in 130 CMR 429.424 for their respective professions. Of these, one must be a psychiatrist, and two must be from separate nonphysician core disciplines, including psychology, social work, or psychiatric nursing. Certain additional staffing requirements are contained in 130 CMR 429.423.

(B)  The staff must have specific training and experience to treat the target populations of the center. For example, staff treating children are required to have specialized training and experience in children's services. As further described in 130 CMR 429.424, staff who provide individual, group, and family therapy to members under the age of 21 must be certified every two years to administer the Child and Adolescent Needs and Strengths (CANS), according to the process established by the Executive Office of Health and Human Services (EOHHS).

(C)  For clinic-licensed mental health centers, the staff composition requirements are contained in 130 CMR 429.422 and 429.423. Clinic-licensed mental health centers must employ the equivalent of at least three full-time professional staff members, two of whom must be core team members who meet qualifications outlined in 130 CMR 429.423 for their respective disciplines. When a clinic-licensed mental health center has 10 employees or fewer, the core team members must work a minimum of 20 hours a week.

(D)  Dependent satellite programs must employ at least two full-time equivalent professional staff members from separate nonphysician core disciplines. The Director of Clinical Services at the parent center must ensure that supervision requirements of 130 CMR 429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core disciplines as outlined in 130 CMR 429.424, they must receive supervision from qualified core staff professionals of the same discipline at the parent center.

(E)  For clinic-licensed community health centers, the center must employ at least two half-time professional staff members from separate, nonphysician core disciplines who meet the qualifications outlined in 130 CMR 429.424 for their respective disciplines.

(F)  Autonomous satellite programs, as defined in 130 CMR 429.402, must meet the requirement's specified in 130 CMR 429.422(C).

429.423:  Position Specifications and Qualifications

(A)  Administrator.  The mental health center must designate one individual as administrator, who is responsible for the overall operation and management of the center and for ensuring compliance with MassHealth regulations. The administrator must have previous training or experience in personnel, fiscal, and data management, as described in 130 CMR 429.438.
    (1)  The same individual may serve as both the administrator and clinical director.
    (2)  In a community health center, the administrator of the entire facility may also administer the mental health center program.

A-23

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-11 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(B)  Director of Clinical Services.  Mental health centers must designate a professional staff member to be the clinical director who is then responsible to the administrator for the direction and control of all professional staff members and services.

(1)  The clinical director must be licensed, certified, or registered to practice in one of the core disciplines listed in 130 CMR 429.424, and must have had at least five years of full-time, supervised clinical experience subsequent to obtaining a master's degree, two years of which must have been in an administrative capacity. The clinical director must be employed on a full-time basis. When the clinic is licensed as a community health center, the clinical director must work at the center at least half-time.

(2)  The specific responsibilities of the clinical director include

(a)  selection of clinical staff and maintenance of a complete staffing schedule;

(b)  establishment of job descriptions and assignment of staff;

(c)  overall supervision of staff performance;

(d)  accountability for adequacy and appropriateness of patient care;

(e)  in conjunction with the medical director, accountability for employing adequate psychiatric staff to meet the psychopharmalogical needs of clients;

(f)  establishment of policies and procedures for patient care;

(g)  program evaluation;

(h)  provision of some direct patient care in circumstances where the clinical director is one of the three minimum full-time equivalent staff members of the center;

(i)  development of in-service training for professional staff; and

(j)  establishment of a quality management program.

(C)  Medical Director.  The mental health center must designate a psychiatrist who meets the qualifications outlined in 130 CMR 429.424(A) as the medical director, who is then responsible for establishing all medical policies and protocols and for supervising all medical services provided by the staff. The medical director must work at the center a minimum of eight hours a week. When the clinic is licensed as a community health center, the medical director must work at the center at least four hours a week.

(D)  Psychiatrist.

(1)  The roles and duties of administrator, director of clinical services, and medical director, as detailed in 130 CMR 429.423(A), (B), and (C), may be assumed, all or in part, by a psychiatrist on the center's staff, provided that provision of services to members and performance of all relevant duties in these regulations are carried out to meet professionally recognized standards of health care, as required by MassHealth administrative and billing regulations at 130 CMR 450.000.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-12 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(2)  The role of the psychiatrist in the center, apart from any duties that may be assumed under 130 CMR 429.423(A), (B), or (C), must include the following:

(a)  responsibility for the evaluation of the physiological, neurological, and psychopharmacological status of the center's clients;

(b)  involvement in diagnostic formulations and development of treatment plans;

(c)  direct psychotherapy, when indicated;

(d)  participation in utilization review or quality-assurance activity;

(e)  coordination of the center's relationship with hospitals and provision of general hospital consultations as required;

(f)  supervision of and consultation to other disciplines; and

(g)  clinical coverage on an "on call" basis at all hours of center operation.

429.424:   Qualifications of Staff by Core Discipline

(A)  Psychiatrist.

(1)  At least one staff psychiatrist must either currently be certified by the American Board of Psychiatry and Neurology, or be eligible and applying for such certification.

(2)  Any additional psychiatrists must be, at the minimum, licensed physicians in their second year of a psychiatric residency program accredited by the Council on Medical Education of the American Medical Association. Such physicians must be under the direct supervision of a fully qualified psychiatrist.

(3)  Any psychiatrist or psychiatric resident who provides individual, group, or family therapy to members under the age of 21 must be certified every two years to administer the CANS, according to the process established by the Executive Office of Health and Human Services (EOHHS).

(B)  Psychologist.

(1)  At least one staff psychologist must be licensed by the Massachusetts Board of Registration of Psychologists with a specialization listed in clinical or counseling psychology or a closely related specialty.

(2)  Additional staff members trained in the field of clinical or counseling psychology or a closely related specialty must

(a)  have a minimum of a master's degree or the equivalent graduate study in clinical or counseling psychology or a closely related specialty from an accredited educational institution;

(b)  be currently enrolled in or have completed a doctoral program in clinical or counseling psychology or a closely related specialty; and

(c)  have had two years of full-time supervised clinical experience subsequent to obtaining a master's degree in a multidisciplinary mental-health setting. (One year of supervised clinical work in an organized graduate internship program may be substituted for each year of experience.) All services provided by such additional staff members must be under the direct and continuing supervision of a psychologist meeting the requirements set forth in 130 CMR 429.424(B)(1).

(3)  Any psychologist who provides individual, group, or family therapy to members under the age of 21 must be certified every two years to administer the CANS, according to the process established by the Executive Office of Health and Human Services (EOHHS).

A-25

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-13 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(C) Social Worker.
　(1)  At least one staff social worker must have received a master's degree in social work from an accredited educational institution and must have had at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree. This social worker must also be licensed or have applied for and have a license pending as an independent clinical social worker by the Massachusetts Board of Registration of Social Workers.
　(2)  Any additional social workers on the staff must provide services under the direct and continuous supervision of an independent clinical social worker. Such additional social workers must be licensed or applying for licensure as certified social workers by the Massachusetts Board of Registration of Social Workers and have received a master's degree in social work and completed two years of full-time supervised clinical work in an organized graduate internship program.
　(3)  Any social worker who provides individual, group, or family therapy to members under the age of 21 must be certified every two years to administer the CANS, according to the process established by the Executive Office of Health and Human Services (EOHHS).

(D) Psychiatric Nurse.
　(1)  At least one psychiatric nurse must be currently registered by the Massachusetts Board of Registration in Nursing and must have a master's degree in nursing from an accredited National League of Nursing graduate school with two years of full-time supervised clinical experience in a multidisciplinary mental-health setting and be eligible for certification as a clinical specialist in psychiatric/mental-health nursing by the American Nursing Association.
　(2)  Any other nurses must be currently registered by the Massachusetts Board of Registration in Nursing and must have a bachelor's degree from an educational institution accredited by the National League of Nursing and two years of full-time supervised skilled experience in a multidisciplinary mental-health setting subsequent to that degree, or a master's degree in psychiatric nursing.
　(3)  Any psychiatric nurse mental-health clinical specialist who provides individual, group, or family therapy to members under the age of 21 must be certified every two years to administer the CANS, according to the process established by the Executive Office of Health and Human Services (EOHHS).

A-26

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-14 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(E) <u>Counselor</u>.

(1)  All counselors and unlicensed staff included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D).

(2)  All counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full-time supervised clinical experience in a multidisciplinary mental-health setting subsequent to obtaining the master's degree. (One year of supervised clinical work in an organized graduate internship program may be substituted for each year of full-time experience.)

(3)  Any counselor who provides individual, group, or family therapy to members under the age of 21 must be certified every two years to administer the CANS, according to the process established by the Executive Office of Health and Human Services (EOHHS).

(F) <u>Occupational Therapist</u>.

(1)  Any occupational therapist must be currently registered by the American Occupational Therapy Association and must have

(a)  a master's degree in occupational therapy from an accredited program in occupational therapy; or

(b)  a bachelor's degree in occupational therapy from an accredited program in occupational therapy and a master's degree in a related field such as psychology, social work, or counseling.

(2)  In addition, any occupational therapist must have at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree. (One year of supervised clinical work in an organized graduate internship program may be substituted for each year of full-time experience.)

(130 CMR 429.425 through 429.430 Reserved)

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-15 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.431:  Operating Procedures

(A)  A professional staff member must conduct a comprehensive evaluation of each member prior to initiation of therapy. For members under the age of 21, a CANS must be completed during the initial behavioral-health assessment before the initiation of therapy and be updated at least every 90 days thereafter by a CANS-certified provider, as described in 130 CMR 429.424.

(B)  The center must accept a member for treatment, refer the member for treatment elsewhere, or both, if the intake evaluation substantiates a mental or emotional disorder.

(C)  One professional staff member must assume primary responsibility for each member (the primary therapist).

(D)  The center program must make provisions for responding to persons needing services on a walk-in basis.

(E)  The center must take appropriate steps to facilitate uninterrupted and coordinated member care whenever it refers a member elsewhere for treatment not available at the center or for subsequent treatment.

(F)  Before referring a member elsewhere, the center must, with the member's consent, send a summary of or the actual record of the member to that referral provider prior to initiation of therapy.

429.432:  Treatment Planning and Case Review

In conjunction with the primary therapist, a multidisciplinary team, composed of at least one psychiatrist and any two of the following: a psychologist, a social worker, or a psychiatric nurse (plus any other professional staff deemed appropriate) is responsible for conducting case conference meetings in accordance with the following:

(A)  within four client visits, prepare a comprehensive written treatment plan that is based on the initial evaluation, incorporates short- and long-term treatment goals, and establishes criteria for determining when termination of treatment is appropriate;

(B)  at least once every 90 days, review the member's treatment plan, enter into the member's records an updated statement of the problems, goals, and treatment activities and, if indicated, a reformulation of the treatment plan, and for members under the age of 21, ensure that the CANS has been completed at the initial behavioral-health assessment and is updated at least every 90 days thereafter; and

(C)  review each case at termination of treatment and prepare a termination summary that describes the course of treatment and the aftercare program or resources in which the member is expected to participate.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-16 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.433:  Coordination of Medical Care

A mental health center must coordinate psychotherapeutic treatment with medical care for MassHealth members. If a member has not received a physical exam within six months of the date of intake, the mental health center must advise the member that one is needed. If the member does not have an existing relationship with a physician, the mental health center must assist the member in contacting the MassHealth agency's customer service toll-free line to receive help in selecting a physician. If the member does not want a physical examination, the member's record must document the member's preference and any stated reason for that preference.

429.434:  Schedule of Operations

(A)  There must be at least one location where a freestanding mental health center operates a program that is open at least 40 hours a week.

(B)  A mental health center operated by a clinic-licensed community health center must be open at least 20 hours a week.

(C)  When the center is closed, telephone coverage must be provided by personnel offering referral to operating emergency facilities, on-call clinicians, or other mechanisms for effectively responding to a crisis, in accordance with the requirements set forth at 130 CMR 429.421(B)(13).

429.435:  Utilization Review Plan

The mental health center must have a utilization review plan that meets the following conditions.

(A)  A utilization review committee must be formed, composed of the clinical director (or his or her designee), a psychiatrist, and one other professional staff member from each core discipline represented at the center who meets all the qualifications for the discipline, as outlined in 130 CMR 429.424.

(B)  The utilization review committee must review each of the center's cases at least in the following circumstances:
    (1)  within 90 days of initial contact;
    (2)  when a member has required more than 50 visits every 12 months and has not required hospitalization or extensive crisis intervention during that period; and
    (3)  following termination.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-17 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(C)  The utilization review committee must verify for each case that
    (1)  the diagnosis has been adequately documented;
    (2)  the treatment plan is appropriate and specifies the methods and duration of the projected treatment program;
    (3)  the treatment plan is being or has been carried out;
    (4)  the treatment plan is being or has been modified as indicated by the member's changing status;
    (5)  there is adequate follow-up when a member misses appointments or drops out of treatment;
    (6)  there is progress toward achievement of short- and long-term goals; and
    (7)  for members under the age of 21, the CANS has been completed at the initial behavioral-health assessment and updated at least every 90 days thereafter.

(D)  No staff member can participate in the utilization review committee's deliberations about any member he or she is treating directly.

(E)  The mental health center must maintain minutes that are sufficiently detailed to show the decisions of each review and the basis on which any decisions are made so that the MassHealth agency may conduct such audits as it deems necessary.

(F)  Based on the utilization review, the director of clinical services or his or her designee must determine whether continuation, modification, or termination of treatment is necessary and promptly communicate this decision to the primary therapist.

429.436:  Recordkeeping Requirements

(A)  A mental health center must maintain on its premises either the original record or a microfilm of the original record for each member for a period of at least four years following the date of service. When a member is transferred from a mental health center that is a component of a community health center to an independent agency affiliated with the community health center, the mental health center itself must retain a copy of the member's record if it forwards the record to the affiliated agency.

(B)  The center must obtain written authorization from each member or his or her legal guardian to release information obtained by the center to center staff, federal and state regulatory agencies, and, when applicable, referral providers, to the extent necessary to carry out the purposes of the center program and to meet regulatory requirements. All such information must be released on a confidential basis.

(C)  Each member's record must include the following information:
    (1)  the member's name and case number, MassHealth identification number, address, telephone number, sex, age, date of birth, marital status, next of kin, school or employment status (or both), and date of initial contact;

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-18 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(2)  a report of a physical examination performed within six months of the date of intake or documentation that the member did not want to be examined and any stated reason for that preference;

(3)  the name and address of the member's primary care physician or, if not available, another physician who has treated the member;

(4)  the member's description of the problem, and any additional information from other sources, including the referral source, if any;

(5)  the events precipitating contact with the center;

(6)  the relevant medical, psychosocial, educational, and vocational history;

(7)  a comprehensive functional assessment of the member at intake and semi-annually thereafter;

(8)  the clinical impression of the member and a diagnostic formulation, including a specific diagnosis using standard nomenclature;

(9)  a listing of realistic long-range goals, and a time frame for their achievement;

(10)  a listing of short-term objectives, which must be established in such a way as to lead toward accomplishment of the long-range goals;

(11)  the proposed schedule of therapeutic activities, both in and out of the center, necessary to achieve such goals and objectives and the responsibilities of each individual member of the interdisciplinary team;

(12)  a schedule of dates for utilization review to determine the member's progress in accomplishing goals and objectives;

(13)  the name, qualifications, and discipline of the therapist primarily responsible for the member;

(14)  a written record of quarterly reviews by the primary therapist, which relate to the short- and long-range goals;

(15)  progress notes on each visit written and signed by the primary therapist that include the therapist's discipline and degree, as well as notes by other professional staff members significantly involved in the treatment plan;

(16)  all information and correspondence regarding the member, including appropriately signed and dated consent forms;

(17)  a medication-use profile;

(18)  when the member is discharged, a discharge summary, including a recapitulation of the member's treatment and recommendations for appropriate services concerning follow-up as well as a brief summary of the member's condition and functional performance on discharge; and

(19)  for members under the age of 21, a CANS completed during the initial behavioral-health assessment and updated at least every 90 days thereafter.

(D)  A brief history is acceptable for emergency or walk-in visits when the treatment plan does not call for extended care.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-19 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.437:  Written Policies and Procedures

A mental health center must have and observe written policies and procedures that include

(A)  a statement of its philosophy and objectives;

(B)  criteria for client admission;

(C)  a statement of the geographical area served;

(D)  an intake policy;

(E)  treatment procedures, including, but not limited to, development of the treatment plan, case assignment, case review, discharge planning, and follow-up on clients who leave the program without notice;

(F)  a medication policy that includes prescription, administration, and monitoring data;

(G)  a referral policy, including procedures for ensuring uninterrupted and coordinated client care upon transfer;

(H)  procedures for walk-in clients and clinical emergencies during operating and nonoperating hours;

(I)  a records policy, including what information must be included in each record, and procedures to ensure confidentiality;

(J)  supervisory mechanisms for staff;

(K)  a utilization review plan; and

(L)  explicit fee policies with respect to billing third-party payers and clients, cancellation procedures, and fee reductions.

429.438:  Administration

The mental health center must be organized to facilitate effective decision-making by appropriate personnel on administrative, programmatic, and clinical issues.

(A)  Organization.  The center must establish an organization table showing major operating programs of the facility, with staff divisions, administrative personnel in charge of each program, and their lines of authority, responsibility, and communication.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-20 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(B)  Fiscal Management.  The center must establish a system of business management to ensure accurate accounting for sources and uses of funds and proper expenditure of funds within established budgetary constraints and grant restrictions.

(C)  Data Management.  The center must develop and maintain a statistical information system to collect client, service utilization, and fiscal data necessary for the effective operation of the center.

(D)  Personnel Management.  The center must establish and maintain personnel policies and personnel records for each employee.

(E)  Supervision.
    (1)  Each staff member must receive supervision appropriate to the person's skills and level of professional development. Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor. Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in 130 CMR 429.424.
    (2)  The center must establish and implement procedures for staff training and evaluation. These procedures must require all staff who must be certified to administer the CANS, as described in 130 CMR 429.424, to complete the certification process established by the Executive Office of Health and Human Services (EOHHS).

429.439:  Satellite Programs

        Services provided by a satellite program are reimbursable only if the program meets the standards described below.

(A)  A satellite program must be integrated with the parent center in the following ways.
    (1)  The administrator of the parent center is responsible for ensuring compliance of the satellite program with the regulations in 130 CMR 429.000.
    (2)  There must be clear lines of supervision and communication between personnel of the parent center and its satellite programs. The parent center must maintain close liaison with its satellite programs through conferences or other methods of communication.
    (3)  The satellite program must be subject to all the written policies and procedures of the parent center governing the types of services that the satellite program offers.
    (4)  The satellite program must maintain on its own premises its client records as set forth in 130 CMR 429.436.

(B)  An autonomous satellite program must provide supervision and in-service training to all noncore staff employed at the satellite program.

(C)  The director of clinical services of the parent center must designate one professional staff member at the satellite program as the satellite's clinical director. The clinical director must be employed on a full-time basis and meet all of the requirements in 130 CMR 429.423(B).
    (1)  The supervisor of the satellite program must report regularly to the clinical director of the parent center to ensure ongoing communication and coordination of services.

| Commonwealth of Massachusetts<br>MassHealth<br>Provider Manual Series | Subchapter Number and Title<br>4.  Program Regulations<br>(130 CMR 429.000) | Page<br>4-21 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter<br>MHC-39 | Date<br>12/26/08 |

(2)  In an autonomous satellite program, the supervisor must meet the qualifications required of a core staff member in his or her discipline, as set forth in 130 CMR 429.424.
(3)  In a dependent satellite program, the supervisor must meet the basic qualifications required for his or her discipline, as set forth in 130 CMR 429.424, and receive regular supervision and consultation from qualified core staff at the parent center.

(D)  If a dependent satellite program does not offer the entire range of services available at the parent center, the dependent satellite program must refer clients to the parent center or a facility that offers such services. The parent center must determine the necessity for treatment and the appropriateness of the treatment plan for such clients and institute a clear mechanism through which this responsibility is discharged, by consultation with the satellite program team, regular supervision of the satellite program by supervisory-level professional core staff in the parent center, or by other appropriate means. For staff composition requirements pertaining to dependent satellite programs, see 130 CMR 429.422(D).

429.440:  Outreach Programs

An outreach program operated by a mental health center is eligible for payment if it meets the standards described in 130 CMR 429.440(A) through (G).

(A)  Outreach program staff members must receive supervision and in-service training in accordance with the requirements specified in 130 CMR 429.438(E).

(B)  The director of clinical services must meet at least on a monthly basis with outreach program staff members and have direct contact with outreach program clients as necessary to provide medical diagnosis, evaluation, and treatment in accordance with the requirements outlined in 130 CMR 429.423(B).

(C)  Outreach programs must maintain the records of their clients on the premises of the parent center.

(D)  Outreach programs must be subject to all written policies and procedures of the parent center governing the kinds of services that the outreach program offers.

(E)  Outreach programs must meet the requirements of 130 CMR 429.439(D) applicable to dependent satellite programs.

(F)  Outreach program services must conform to the definition in 130 CMR 429.402.

(G)  Services provided at outreach programs are subject to the requirements in 130 CMR 429.431, 429.432, and 429.435.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4.  Program Regulations (130 CMR 429.000) | Page 4-22 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

429.441:   Service Limitations

(A)  Length and Frequency of Sessions.
(1)  The MassHealth agency pays for diagnostic and treatment services only when a professional staff member, as defined by 130 CMR 429.424, personally provides these services to the member or the member's family, or personally consults with a professional outside of the center. The services must be provided to the member on an individual basis, and are not reimbursable if they are an aspect of service delivery, as defined in 130 CMR 429.408(C).
(2)  The MassHealth agency pays a center for
(a)  a medication visit of brief duration (10 to 15 minutes);
(b)  a half-hour session only when it includes a minimum of 25 minutes of personal interaction with the member (with five minutes for recording data);
(c)  a one-hour session only when it includes a minimum of 50 minutes of personal interaction with the member (with 10 minutes for recording data); and
(d)  a session of longer duration only when it includes personal interaction with the member (with 15 minutes for recording data).
(3)  The MassHealth agency pays for only one session of a single type of service (except for diagnostics) provided to an individual member on one date of service. Return visits on the same date of service are not reimbursable.

(B)  Diagnostic Services.  Payment for diagnostic services provided to a member is limited to a maximum of four hours per member.

(C)  Individual Therapy.  Payment for individual therapy is limited to a maximum of one hour per member per session per day.

(D)  Family Therapy.
(1)  Payment for family therapy is limited to a maximum of one and one-half hours per session per day.
(2)  Payment is also limited to one payment per family therapy visit, regardless of the number of staff or members who are present.
(3)  A clinic-licensed center must claim payment for couple therapy under the service code for family therapy.

(E)  Case Consultation.
(1)  The MassHealth agency pays only for a case consultation that lasts at least 30 minutes and involves a personal meeting with a professional of another agency. Payment is limited to a maximum of one hour per session.
(2)  The MassHealth agency pays for case consultation only when telephone contact, written communication, and other nonreimbursable forms of communication clearly will not suffice. Such circumstances must be documented in the member's record. Such circumstances are limited to situations in which both the center and the other party are actively involved in treatment or management programs with the member (or family members) and where a lack of face-to-face communication would impede a coordinated treatment program.
(3)  The MassHealth agency does not pay a center for court testimony.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-23 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(F) <u>Family Consultation</u>.  The MassHealth agency pays for consultation with the natural or foster parent or legal guardian of a member less than 21 years of age who lives with the child and is responsible for the child's care, and who is not an eligible member, when such consultation is integral to the treatment of the member.

(G) <u>Group Therapy</u>.
    (1)  The MassHealth agency pays only for a group therapy session that has a minimum duration of one and one-half hours and a maximum duration of two hours.
    (2)  Payment is limited to one fee per group member with a maximum of 10 members per group regardless of the number of staff members present.
    (3)  The MassHealth agency does not pay for group therapy when it is performed as an integral part of a psychiatric day treatment program.

(H) <u>Psychological Testing</u>.  The MassHealth agency pays a center for psychological testing only when the following conditions are met.
    (1)  A psychologist who meets the qualifications listed in 130 CMR 429.424(B) either personally administers the testing or personally supervises such testing during its administration by an unlicensed psychologist.
    (2)  A battery of tests is performed. These tests must meet the following standards:
        (a)  the tests are published, valid, and in general use, as evidenced by their review in the current edition of the *Mental Measurement Yearbook* or by their conformity to the *Standards for Educational and Psychological Tests* of the American Psychological Association;
        (b)  unless clinically contraindicated due to hearing, physical, or visual impairment or linguistic challenges, a personality evaluation contains the findings of at least two of the following test types or their age-appropriate equivalents:  Rorschach, TAT (Thematic Apperception Test), TED (Tasks of Emotional Development), or MMPI (Minnesota Multiphasic Personality Inventory), and one or more of the following test types:  figure drawing, Bender Gestalt, or word association;
        (c)  unless clinically contraindicated due to hearing, physical, or visual impairment or linguistic challenges, intelligence testing includes either a full Wechsler or Stanford-Binet instrument; and
        (d)  unless clinically contraindicated due to hearing, physical, or visual impairment or linguistic challenges, assessment of brain damage must contain at least the findings of a Wechsler Intelligence Scale and tests of recent memory, visual-space perception, and other functions commonly associated with brain damage.
    (3)  Except as explained below, the MassHealth agency does not pay for
        (a)  self-rating forms and other paper-and-pencil instruments, unless administered as part of a comprehensive battery of tests;
        (b)  group forms of intelligence tests; or

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-24 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(c) a repetition of any psychological test or tests provided by the mental health center or any independent psychologist to the same member within the preceding six months, unless accompanied by documentation demonstrating that the purpose of the repeated testing is to ascertain the following types of changes (submission of such documentation with the claim for payment is sufficient when the psychological test or tests are to be performed on the same member a second time within a six-month period):

  (i) following such special forms of treatment or intervention as electroshock therapy or psychiatric hospitalization (periodic testing to measure the member's response to psychotherapy is not reimbursable); or

  (ii) relating to suicidal, homicidal, toxic, traumatic, or neurological conditions.

(4) Testing of a member requested by responsible parties, such as but not limited to physicians, clinics, hospitals, schools, courts, group homes, or state agencies, must be documented in the member's record. Such documentation must include the referral source and the reason for the referral.

(I) Medication Visits. The MassHealth agency does not pay for a medication visit as a separate service when it is performed as part of another treatment service (for example, a diagnostic assessment or individual or group therapy performed by a psychiatrist).

(J) Home Visits.
(1) The MassHealth agency pays for intermittent home visits.
(2) Home visits are reimbursable on the same basis as comparable services provided at the center. Travel time to and from the member's home is not a reimbursable service.
(3) A report of the home visit must be entered into the member's record.

(K) Multiple Therapies. The MassHealth agency pays for more than one mode of therapy used for a member during one week only if clinically justified; that is, when any single approach has been shown to be necessary but insufficient. The need for additional modes of treatment must be documented in the member's record.

(L) Emergency Services. The MassHealth agency pays for crisis intervention as defined in 130 CMR 429.402 subject to the following limitations.
(1) The MassHealth agency pays for no more than two hours of emergency services per member on a single date of service.
(2) The MassHealth agency pays only for face-to-face contacts; telephone contact is not a reimbursable service.
(3) The need for crisis intervention must be fully documented in the member's record for each date of emergency services.

| Commonwealth of Massachusetts MassHealth Provider Manual Series | Subchapter Number and Title 4. Program Regulations (130 CMR 429.000) | Page 4-25 |
|---|---|---|
| Mental Health Center Manual | Transmittal Letter MHC-39 | Date 12/26/08 |

(M)  Outreach Services Provided in Nursing Facilities.

(1) The MassHealth agency pays a center for diagnostic and treatment services provided to a member residing in a nursing facility under the following circumstances and conditions:

(a)  the nursing facility specifically requests treatment, and the member's record at the nursing facility documents this request;

(b)  the treatment provided does not duplicate services that should be provided in the nursing facility; and

(c)  such services are generally available through the center to members not residing in that nursing facility.

(2) The following conditions must be met:

(a)  the member's record at the parent center must contain all of the information listed in 130 CMR 429.436;

(b)  the member's record at the nursing facility must contain information pertaining to diagnostic and treatment services including, but not limited to, medication, treatment plan, progress notes on services, case review, and utilization review; and

(c)  the member must function at a sufficient level to benefit from treatment as established by a clinical evaluation and by accepted standards of practice.

429.442:  Child and Adolescent Needs and Strengths (CANS) Data Reporting

For each Child and Adolescent Needs and Strengths (CANS) conducted, the mental health center must report data collected during the assessment to the MassHealth agency, in the manner and format specified by the MassHealth agency.

REGULATORY AUTHORITY

130 CMR 429.000:  M.G.L. c. 118E, ss. 7 and 12.